IN THE

# SUPREME COURT OF THE STATE OF ARIZONA

STATE OF ARIZONA,
*Appellee,*

*v.*

CARLOS ANDRES MACIEL,
*Appellant.*

No. CR-15-0346-PR
Filed July 29, 2016

Appeal from the Superior Court in Yuma County
The Honorable David M. Haws, Judge
No. CR201300422
**AFFIRMED**

Opinion of the Court of Appeals, Division One
238 Ariz. 200, 358 P.3d 621 (App. 2015)
**VACATED**

COUNSEL:

Mark Brnovich, Arizona Attorney General, John R. Lopez IV, Solicitor General, Joseph T. Maziarz (argued), Chief Counsel, Criminal Appeals Section, Phoenix, Attorneys for State of Arizona

Michael A. Breeze, Yuma County Public Defender, Edward F. McGee (argued), Deputy Public Defender, Yuma, Attorneys for Carlos Andres Maciel

CHIEF JUSTICE BALES authored the opinion of the Court, in which VICE CHIEF JUSTICE PELANDER and JUSTICES BRUTINEL, TIMMER, and BOLICK joined.

CHIEF JUSTICE BALES, opinion of the Court:

¶1      Statements a person makes in response to "in custody" interrogation cannot be used to establish the person's guilt if they are not preceded by the warnings required by *Miranda v. Arizona*, 384 U.S. 436

(1966). We here hold that Carlos Andres Maciel's statements are admissible because he was not in custody for *Miranda* purposes when police detained him outside a vacant building and questioned him about a suspected burglary.

**I.**

¶2 A motorist saw Maciel seated on a curb outside a vacant building that had a broken window. The building belonged to a church located on the same property. Noting a board that had covered the window was missing, and knowing about previous break-ins, the motorist called the police. Officer Christopher Huntley was dispatched to investigate.

¶3 Officer Huntley parked his patrol car in the church's parking lot next to the vacant building. After speaking with the motorist, Officer Huntley approached Maciel, who was still seated a few feet from the broken window. Nearby, Maciel had his personal possessions in a shopping cart. At the officer's request, Maciel provided identification and agreed to submit to a pat-down search for weapons. After confirming that Maciel was unarmed and had no outstanding warrants, Officer Huntley asked "what he was doing" and if he knew "how the board got removed from the window." Maciel said he was just sitting down and denied knowing anything about the board's removal. Because Officer Huntley did not know whether anyone was inside the building, he asked Maciel to sit in the patrol car until another officer arrived. Within minutes, a second officer arrived and Maciel was then asked to sit on a curb in the parking lot while the second officer stood nearby. Maciel complied.

¶4 About that same time, a third officer arrived and helped Officer Huntley check the building's perimeter for unsecured doors. While the officers spent a few minutes doing so, the church pastor arrived. He told Officer Huntley that three days earlier a board had covered the broken window. The pastor also said he would be willing to pursue charges if a suspect was identified. Officer Huntley returned to Maciel and again asked him about the window. Maciel admitted removing the board the day before and entering the building to look for money. Maciel was then arrested, handcuffed, and placed in the patrol car.

¶5 After arresting Maciel, Officer Huntley and the third officer searched the vacant building. Apart from the broken window, there was no evidence of entry, and the pastor could not identify anything missing.

Officer Huntley returned to his patrol car, advised Maciel of his *Miranda* rights, and again asked him about entering the building. Maciel again said that he had removed the board and gone inside. From the time Huntley arrived at the scene, the entire investigation lasted about an hour.

¶6 Before his trial for burglary, Maciel moved to suppress his statements to the police. After an evidentiary hearing, the trial court applied the test enunciated in *State v. Cruz-Mata*, 138 Ariz. 370, 373, 674 P.2d 1368, 1371 (1983), and denied the motion, reasoning that when Maciel was sitting on the curb he was not in custody for *Miranda* purposes. A jury subsequently found Maciel guilty of third-degree burglary. The trial court suspended the sentence, placed Maciel on intensive probation for thirty-six months, and ordered him to serve thirty days in jail as a condition of probation.

¶7 The court of appeals, in a split decision, affirmed the trial court's denial of the motion to suppress. *State v. Maciel*, 238 Ariz. 200, 206 ¶¶ 25–26, 207 ¶ 31, 358 P.3d 621, 627, 628 (App. 2015). The majority agreed with the trial court that Maciel was not in custody when questioned on the curb. *Id.* at 204 ¶ 16, 205 ¶ 20, 358 P.3d at 625, 626. The dissent reasoned that Maciel was in custody because he was not free to terminate the encounter with the police. *Id.* at 209 ¶ 41, 210 ¶ 47, 358 P.3d at 630, 631 (Swann, J., dissenting).

¶8 We granted review because the proper standard for determining if someone is in custody for *Miranda* purposes is a recurring issue of statewide importance. We have jurisdiction pursuant to article 6, section 5(3), of the Arizona Constitution and A.R.S. § 12-120.24.

## II.

¶9 In reviewing rulings on motions to suppress, we consider only the evidence presented at the suppression hearing and view the facts in the light most favorable to sustaining the trial court's ruling. *State v. Wilson*, 237 Ariz. 296, 298 ¶ 7, 350 P.3d 800, 802 (2015); *State v. Dean*, 206 Ariz. 158, 161 ¶ 9, 76 P.3d 429, 432 (2003). We will not disturb the trial court's ruling absent an abuse of discretion. *Dean*, 206 Ariz. at 161 ¶ 9, 76 P.3d at 432. An error of law constitutes an abuse of discretion. *State v. Bernstein*, 237 Ariz. 226, 228 ¶ 9, 349 P.3d 200, 202 (2015).

**A.**

**¶10** The Fifth Amendment to the U.S. Constitution shields all persons from compulsory self-incrimination. To safeguard this privilege, law enforcement officers must provide the well-known *Miranda* warnings before interrogating a person in custody. *Miranda*, 384 U.S. at 478–79. These warnings are deemed necessary because "without proper safeguards the process of in-custody interrogation of persons suspected or accused of crime contains inherently compelling pressures which work to undermine the individual's will to resist and to compel him to speak where he would not otherwise do so freely." *Id.* at 467; *see also Dickerson v. United States*, 530 U.S. 428, 438–40 (2000) (holding that *Miranda* established a constitutional rule).

**¶11** We have previously held that whether a person is "in custody" for *Miranda* purposes ultimately depends on whether there is a "formal arrest or restraint on freedom of movement of the degree associated with a formal arrest." *Cruz-Mata*, 138 Ariz. at 373–74, 674 P.2d at 1371–72 (quoting *California v. Beheler*, 463 U.S. 1121, 1125 (1983)); *see also State v. Perea*, 142 Ariz. 352, 354, 690 P.2d 71, 73 (1984) (noting that *Miranda* custody is "determined by an objective test of whether a reasonable person would feel deprived of his freedom in a significant way"). Our cases analyzed three factors when considering *Miranda* custody: the site of the questioning, the presence of objective indicia of arrest, and the length and form of the interrogation. *State v. Fulminante*, 161 Ariz. 237, 243, 778 P.2d 602, 608 (1988) (quoting *Cruz-Mata*, 138 Ariz. at 373, 674 P.2d at 1371).

**¶12** Since our decisions in *Cruz-Mata*, *Perea*, and *Fulminante*, the United States Supreme Court has made clear that restraint on freedom of movement alone does not establish *Miranda* custody. *Howes v. Fields*, 132 S. Ct. 1181, 1189–90 (2012); *Maryland v. Shatzer*, 559 U.S. 98, 112–13 (2010); *see also Berkemer v. McCarty*, 468 U.S. 420, 436–37 (1984) (declining to "accord talismanic power" to the phrase "freedom of action"). "Custody" for *Miranda* purposes "is a term of art that specifies circumstances that are thought generally to present a serious danger of coercion." *Howes*, 132 S. Ct. at 1189. *Miranda* custody requires not only curtailment of an individual's freedom of action, but also an environment that "presents the same inherently coercive pressures as the type of station house questioning at issue in *Miranda*." *Id.* at 1189–90. For this reason, the Court has held that individuals are not in *Miranda* custody when they are subjected to traffic

stops and investigative detentions – sometimes referred to as "*Terry* stops." *Shatzer*, 559 U.S. at 113 (citing *Terry v. Ohio*, 392 U.S. 1 (1968)); *United States v. Sharpe*, 470 U.S. 675, 677–78, 685–87 (1985).

¶13        Consistent with Supreme Court precedent, we must consider both whether Maciel's freedom of action was significantly curtailed and, if so, whether the environment in which he was questioned presented inherently coercive pressures similar to a station house interrogation.

**B.**

¶14        A person's freedom of movement has been significantly curtailed if "a reasonable person would have felt he or she was not at liberty to terminate the interrogation and leave." *Howes*, 132 S. Ct. at 1189 (quoting *Thompson v. Keohane*, 516 U.S. 99, 112 (1995)). To determine how a suspect would have gauged his or her freedom of movement, we must evaluate "all of the circumstances surrounding the interrogation," not just the three factors identified in *Cruz-Mata*. *See id.* (quoting *Stansbury v. California*, 511 U.S. 318, 322 (1994)).

¶15        Under the circumstances here, a reasonable person would not have felt he or she was at liberty to end the encounter with Officer Huntley and leave – a point conceded by the State and confirmed by the record. After asking Maciel for identification and to submit to a pat-down search for weapons, Officer Huntley asked Maciel to sit in the back of the patrol car. The officer did not recall if the door was opened or closed, but he remained nearby while Maciel was inside. After a couple of minutes, Officer Huntley asked Maciel to get out and sit on the curb by the vacant building. The second officer stood nearby Maciel while Officer Huntley and the third officer checked the building. Maciel was under constant police supervision from the time Officer Huntley first spoke to him. No reasonable person would have felt free to simply walk away.

**C.**

¶16        That Maciel's freedom of movement was significantly curtailed does not end our analysis. *Miranda* custody also requires an environment presenting "inherently coercive pressures" that threaten to subjugate the individual to the examiner's will. *Howes*, 132 S. Ct. at 1189–90; *Shatzer*, 559 U.S. at 112–13; *Miranda*, 384 U.S. at 467. Various objective

factors can create an inherently coercive environment, and the Supreme Court has noted that no one factor controls. *E.g.*, *Howes*, 132 S. Ct. at 1189; *Stansbury*, 511 U.S. at 321–22. But central to *Miranda*'s concerns are incommunicado or prolonged interrogations intended to undermine a subject's will to resist self-incrimination. *E.g.*, *Berkemer*, 468 U.S. at 438–39; *Howes*, 132 S. Ct. at 1190–91; *Shatzer*, 559 U.S. at 113–14; *Miranda*, 384 U.S. at 448–51, 457–58.

¶17 Recognizing the coercive pressures inherent in custodial interrogation, courts begin by considering two police tactics intended to provide a psychological advantage over the subject: questioning in unfamiliar surroundings and isolation. *Miranda*, 384 U.S. at 448–50. *Howes* explained that "[i]n the paradigmatic *Miranda* situation – a person is arrested in his home or on the street and whisked to a police station for questioning – detention represents a sharp and ominous change, and the shock may give rise to coercive pressures." 132 S. Ct. at 1190. In contrast, coercion is often lacking when a person is questioned in familiar surroundings. *Id.* at 1190–91. Thus, *Howes* held that prisoners questioned in their place of incarceration are not categorically in *Miranda* custody, even though their freedom of action has been significantly restrained. *Id.* at 1191; *see also Shatzer*, 559 U.S. at 112–13.

¶18 Similarly, exposure to public view during questioning can dispel the danger of coercion. *E.g.*, *Berkemer*, 468 U.S. at 438–39 (explaining that "exposure to public view" offsets the dangers of coercion because it "both reduces the ability of an unscrupulous policeman to use illegitimate means to elicit self-incriminating statements and diminishes the [subject's] fear that, if he does not cooperate, he will be subjected to abuse"). Partly for this reason, investigative stops conducted in public often do not constitute *Miranda* custody. *Id.* at 438–40.

¶19 The length of interrogation is also relevant. The temporary and relatively nonthreatening detention associated with traffic and investigative stops does not constitute *Miranda* custody. *See Shatzer*, 559 U.S. at 113; *Howes*, 132 S. Ct. at 1190; *Berkemer*, 468 U.S. at 440; *Sharpe*, 470 U.S. at 677–78, 685–87. In contrast, even questioning in public may constitute a de facto arrest when an investigative detention is unreasonably prolonged. *State v. Boteo-Flores*, 230 Ariz. 105, 106, 280 P.3d 1239, 1240 (2012). No rigid time limit controls the analysis. *Sharpe*, 470 U.S. at 685–86; *Boteo-Flores*, 230 Ariz. at 108 ¶¶ 14–15, 280 P.3d at 1242. Instead, "common

sense and ordinary human experience must govern." *Sharpe*, 470 U.S. at 685. "In assessing whether a detention is too long in duration to be justified as an investigative stop," we examine whether the police "diligently pursued a means of investigation that was likely to confirm or dispel their suspicions quickly." *Id.* at 686; *Boteo-Flores*, 230 Ariz. at 108 ¶ 15, 280 P.3d at 1242.

¶20 This inquiry depends upon the circumstances to which police are responding. *Sharpe*, 470 U.S. at 685–86; *Boteo-Flores*, 230 Ariz. at 108 ¶ 14, 280 P.3d at 1242. "If the purpose underlying a *Terry* stop – investigating possible criminal activity – is to be served, the police must under certain circumstances be able to detain the individual for longer than the brief time period involved in *Terry*." *Sharpe*, 470 U.S. at 685–86 (quoting *Michigan v. Summers*, 452 U.S. 692, 700 (1981)). The ultimate question is whether the police engaged in unreasonable delay during the investigation to gain an advantage over the subject, thereby increasing the likelihood of self-incrimination. *See id.*; *see also Berkemer*, 468 U.S. at 437–38, 438 n.27.

¶21 Here, Maciel was not questioned in isolation or in unfamiliar surroundings. Officer Huntley first questioned Maciel exactly where he found him – sitting on the ground near the broken window. Although Maciel was asked to sit in the back of the officer's patrol car – which was parked adjacent to where Maciel had been sitting – he was only in the vehicle for a "couple of minutes" and was not questioned during that time. Maciel was not transported to a different location. Once the second officer arrived, Maciel was allowed to get out and again sat on a curb near the building. When Officer Huntley questioned him, Maciel was only feet from where he was sitting when he was first contacted. This was not a disorienting and "abrupt transport from the street" to a police-dominated atmosphere like a station house. *See Howes*, 132 S. Ct. at 1190–91.

¶22 Maciel also was not interrogated while "cut off" from the outside world. The entire encounter occurred in public and was at all times visible to passersby. Such public questioning substantially offsets "the aura of authority surrounding an armed, uniformed officer" that can otherwise exert some pressure on a detainee to respond to questions. *See Berkemer*, 468 U.S. at 438.

¶23 Moreover, the officers did not unreasonably delay their investigation. The officers were responding to a dispatch for a suspected

burglary. Such an investigation might reasonably require a slightly longer investigative detention than a typical traffic or *Terry* stop. *Cf. Sharpe*, 470 U.S. at 685–86; *Boteo-Flores*, 230 Ariz. at 108 ¶ 14, 280 P.3d at 1242. The investigative detention here – from the time Maciel was first asked to sit in Officer Huntley's patrol car until he was formally arrested – lasted less than one hour. That duration alone does not turn the encounter into a de facto arrest. *See Boteo-Flores*, 230 Ariz. at 108 ¶¶ 14–15, 109 ¶ 17, 280 P.3d at 1242–43 (noting that reasonableness of detention depends upon the surrounding circumstances).

¶24 Consistent with the motorist's telephone report, Officer Huntley encountered Maciel sitting near the vacant building. When the officer first asked what he was doing, Maciel said he was "just sitting there" and the broken window "was like that when he had come there." Officer Huntley acted reasonably in continuing the investigation. Within minutes, the officers checked the building perimeter while Maciel sat on the curb with another officer watching him. During this inspection – which itself only took a few minutes – the church pastor arrived. He informed Officer Huntley that the window was boarded up three days earlier. After obtaining additional information from the pastor, Officer Huntley returned to Maciel and again asked him about the window. Maciel then admitted that he had pulled the board off the window and entered the building to look for money.

¶25 Under these circumstances, the officers acted reasonably and efficiently in the unfolding burglary investigation. *See State v. Spreitz*, 190 Ariz. 129, 143–44, 945 P.2d 1260, 1274–75 (1997) (holding that forty-five minute *Terry* detention was reasonable under circumstances); s*ee also Cruz-Mata*, 138 Ariz. at 373, 674 P.2d at 1371 (holding that interrogation in police station for one and one-half hours did not amount to *Miranda* custody); *State v. Carter*, 145 Ariz. 101, 106, 700 P.2d 488, 493 (1985) (holding interrogation at police station for approximately one hour before *Miranda* warnings were provided did not amount to custody or coercive environment).

¶26 Other objective factors indicative of *Miranda* custody are absent here. The police presence was relatively modest; often only one officer was with Maciel and there were never more than three at one time. *Cf. Berkemer*, 468 U.S. at 438–39 (explaining that the presence of only one or two officers diminishes a subject's "sense of vulnerability" that leads to a coercive environment). As in *Berkemer*, Maciel was never told that his

detention was not temporary. *Id.* at 441–42. Maciel was asked only a few questions, all within the scope of the investigation. *Id.* at 439, 442.

¶27 The police did not threaten force, make exaggerated displays of authority, or otherwise employ coercive tactics. *See Cruz-Mata*, 138 Ariz. at 373, 674 P.2d at 1371 (noting absence of such factors in finding no *Miranda* custody); *Carter*, 145 Ariz. at 106, 700 P.2d at 493 (same); *United States v. Torres-Sanchez*, 83 F.3d 1123, 1129 (9th Cir. 1996) (same). Maciel was not handcuffed, moved from one location to another, or otherwise physically restrained before he was formally arrested. *See Howes*, 132 S. Ct. at 1193 (noting lack of physical restraints weighs against finding *Miranda* custody); *Cruz-Mata*, 138 Ariz. at 373, 674 P.2d at 1371 (same); *Carter*, 145 Ariz. at 106, 700 P.2d at 493 (same). Nor does the record suggest the police seized his property (the shopping cart and its contents). *Cf. State v. Farris*, 849 N.E. 2d 985, 990 ¶ 14 (Ohio 2006) (noting, in finding *Miranda* custody, that officer had seized car keys and told suspect he would be detained until officer decided to return the keys).

¶28 That the pastor informed Officer Huntley that he would be willing to pursue burglary charges is of no consequence. *Miranda* custody does not turn on an officer's undisclosed suspicions about a person's possible guilt. *See Stansbury*, 511 U.S. at 325–26. Conversely, "[a]n officer's knowledge or beliefs may bear upon the custody issue if they are conveyed, by word or deed, to the individual being questioned." *Id.* at 325. Nothing in the record indicates that Officer Huntley conveyed to Maciel that the pastor was willing to press charges or that Huntley believed Maciel had broken into the building.

¶29 In sum, the objective circumstances of Maciel's curbside questioning did not present "inherently coercive pressures" comparable to the station house questioning in *Miranda*. The trial court did not err in ruling that Maciel was not in custody and in denying his motion to suppress. Because we agree with the ruling in this respect, we need not address Maciel's argument that, because his earlier statements violated *Miranda*, his post-arrest statements should also have been suppressed based on *Missouri v. Seibert*, 542 U.S. 600 (2004), or *Oregon v. Elstad*, 470 U.S. 298 (1985).

## III.

¶**30**          We affirm the trial court's order denying the motion to suppress, affirm Maciel's conviction and probationary term, and vacate the opinion of the court of appeals.