NOTICE: NOT FOR OFFICIAL PUBLICATION.
UNDER ARIZONA RULE OF THE SUPREME COURT 111(c), THIS DECISION IS NOT PRECEDENTIAL
AND MAY BE CITED ONLY AS AUTHORIZED BY RULE.

IN THE

# ARIZONA COURT OF APPEALS
### DIVISION ONE

STATE OF ARIZONA, *Appellee,*

*v.*

DION LEE EARL, *Appellant.*

No. 1 CA-CR 19-0592

FILED 1-19-2021

Appeal from the Superior Court in Maricopa County
No. CR2017-149648-001
The Honorable Suzanne E. Cohen, Judge

**AFFIRMED**

COUNSEL

Arizona Attorney General's Office, Phoenix
By Gracynthia Claw
*Counsel for Appellee*

The Stavris Law Firm PLLC, Scottsdale
By Alison Stavris
*Counsel for Appellant*

_____

**MEMORANDUM DECISION**

Judge Randall M. Howe delivered the decision of the Court, in which Presiding Judge Jennifer M. Perkins and Judge Maria Elena Cruz joined.

_____

**H O W E**, Judge:

¶1        Dion Earl appeals his convictions and sentences for sexual assault, kidnapping, sexual abuse, public sexual indecency, and assault. For the following reasons, we affirm.

## FACTS AND PROCEDURAL HISTORY

¶2        In September 2017, Earl hired N.A., 21, to work as a live-in nanny for his children. Earl and N.A. met at the airport and he took her to his home, arriving around midnight. That night, Earl went to N.A.'s bedroom and asked her to give him a massage. After she refused, Earl asked her if she would massage him for $100. She again refused and Earl left the room.

¶3        A little later, Earl called for N.A. to come and help him because one of the children woke up. As N.A. walked down the hallway, she felt Earl, who was naked, grab her arm and pull her into his bedroom and onto the bed. He pinned her arm underneath her to prevent her from moving. He then put his hands inside her pants and put his fingers inside her vagina and rubbed her breasts. While this was happening, N.A. realized that two of Earl's children were sleeping in his bed.

¶4        N.A. eventually freed herself from Earl and ran to the front door, which was locked and required a code to open. Earl came to the front door and offered her $100 "to keep quiet" before he unlocked the door. N.A. left and called for a taxi while Earl continued to offer her money to keep her quiet. The taxi driver picked N.A. up and dropped her off at her grandmother's house. The driver then called the police because he was concerned for N.A. based on her demeanor during the ride home.

¶5        During that same time, Earl hired I.W., 18, to babysit his children. In October 2017, when Earl was out of town, his wife asked I.W. babysit the children while she went out one evening. The next day, I.W. took Earl's wife to pick up her car. I.W. then returned to Earl's house and found him there alone. He gave her an intimate hug. After telling Earl that

she needed to leave, he asked her to follow him to his bedroom so he could pay her. When they reached his bedroom, he closed and locked the door. He tried to hug her again and pulled her with him as he fell onto the bed. Earl then put his hand down her pants and rubbed her bottom. She got up and tried to leave but Earl grabbed her by the arm again and pulled his pants down and masturbated in front of her. She walked to the bedroom door unlocked it and walked toward the front door. Earl followed, gave her money and she left. I.W. later reported what Earl had done to the police.

¶6　　　　　Earl was arrested and charged with sexual assault, two counts of kidnapping, sexual abuse, public sexual indecency, and assault. Before trial, the State moved under Arizona Rule of Evidence 404(c) to admit other act evidence of Earl's previous non-consensual sexual acts with five different women. The trial court held an evidentiary hearing during which recorded interviews of the other act victims were played.

¶7　　　　　One of the women, E.B., said in her interview that in September 2014, Earl hired her to be dancer for a soccer team that he had recently purchased in Washington state. She said that on one occasion, Earl texted her and asked for a massage and that "he was very infatuated with massages." The day after texting her, she went to Earl's house for a meeting and when she arrived, he gave her a "lingering hug." He told her that he wanted to give her a massage and that he wanted her to give him a massage, but she declined. He then came closer and laid on her lap and again asked her to massage him. She tried to get up, but he pushed her down, climbed on top of her and kissed her, "dry hump[ed] her," and groped her breasts. She repeatedly told him to stop before she got up and left as Earl said, "what happened here, stays here."

¶8　　　　　Another woman was J.R., 24, whom Earl also hired as a dancer for the soccer team. She stated that one evening, Earl asked her to help him pass out fliers for the soccer team. Afterwards, he told her that they were going to a strip club. When they arrived, he took her to a private room with a dancer. Earl put one of his hands on J.R.'s thigh and moved it up to "graze[] her vagina." He also kissed her neck, pulled her bra strap down and kissed her breast. J.R. got up and left as Earl said what happens at the strip club, stays at the strip club.

¶9　　　　　A third woman, C.G., said that she babysat for Earl for two years starting around September 2015, when she was 18 years old. On one occasion, she traveled with Earl and his family to Nevada and stayed in a separate hotel room. That evening, Earl invited her to a strip club. When C.G. hesitated, Earl told her that he was coming over to her room and that

she "owe[d] [him] a massage." When he got to her room, he told her to massage him, but she declined. He then put her hands on his body to mimic a massage and pulled her on top of him. C.G. massaged his chest, but Earl kept trying to push her hands lower and she told him no. He then got up and left.

¶10     C.G. said that on another trip to Nevada in 2016, she stayed in the family suite and slept in the children's bedroom. Earl came in and tried to "spoon" with her, rubbed his hands over her body, groped her breasts, and got an erection. She pretended she was sleeping, wiggled him off her, and he left. In Arizona in early 2016, when C.G. was upset, Earl hugged her while wearing only a towel. When C.G. felt that Earl had an erection, she pulled away from him. He then had her follow him to his room, closed and locked the door, and had her lay on his bed so they could talk. He then pulled her into him and snuggled her. She eventually got up and said she was going to check on the kids.

¶11     After hearing the recorded interviews of the five women, the trial court denied the State's motion to allow two of the women to testify, but did grant the motion to allow E.B., J.R., and C.G. to testify as other act witnesses under Rule 404(c). It found that the State had proved by clear and convincing evidence that Earl had committed the other acts, the other acts provided a reasonable basis for the jury to infer that Earl had a character trait giving rise to aberrant sexual propensity to commit the charged offenses, the other acts were not remote in time, and admission of the other act evidence was not unfairly prejudicial under Arizona Rule of Evidence 403. All three other act victims testified at trial and were cross-examined by Earl.

¶12     Jolene Larson, a registered nurse, testified that as part of her examination of N.A., she asked what had happened to her body. Earl objected to N.A.'s statements on hearsay grounds. The court overruled the objection, finding that the statements were made for the purpose of medical treatment. She then testified that N.A. told her that

> [h]e grabbed me by my arms and pulled me on the bed. He had my right arm under him pinned so I couldn't move. Then he started rubbing on me on my back, my shoulders and my neck over the clothes. Then he grabbed my left hand and made me touch his penis with my palm, and then I balled my fist up so my knuckles were rubbing against his penis. Then he took his hand and put it in my pants and put his fingers inside of my vagina. Then he started rubbing by butt and back

4

and he was rubbing on the straps of my bra. That he was telling me to be quiet and not wake the girls up. I was trying to fight off—fight off him and get up and he had a code on the door so I couldn't get out.

**¶13**        She further testified that asking questions about what happened to the patient's body, helps guide the exam, and that her job is to collect swab samples based on what the patient tells her. She also gave N.A. medication, prescriptions, and aftercare instructions.

**¶14**        Detective Robert Russo testified that when he interviewed Earl, he did not admit to doing anything without the consent of the victims. He testified that Earl told him that I.W. initiated the hug between them and that I.W. kissed him and touched his penis. He further testified that Earl told several versions about what had happened, denying any physical contact initially and never mentioned the bedroom until Earl was told about a picture that I.W. had taken in the bedroom. Russo also testified that when he asked Earl about an interaction with N.M., Earl's story changed when confronted with N.A.'s statement that she and Earl were in his bedroom.

**¶15**        After the State rested, Earl moved for a judgment of acquittal, arguing that the State presented no corroborating evidence, no scientific evidence, and no DNA evidence. He further argued that the victims' testimonies were inconsistent. The State responded that the victims' testimonies were consistent, and that substantial evidence existed such that a jury could find Earl guilty. The court therefore denied Earl's motion.

**¶16**        After trial, Earl was convicted of the charged offenses and was sentenced to 7 years' imprisonment for sexual assault, 5 years' imprisonment for each kidnapping conviction, lifetime probation for sexual abuse, 6 months' jail for public sexual indecency, and 30 days' jail for assault with 714 days' presentence incarceration credit. Earl timely appealed.

## DISCUSSION

**¶17**        Earl argues that the trial court erred by finding that the other act evidence was admissible because his right to confront the three other act victims was violated, as none of them were present at the evidentiary hearing. When a defendant does not object at trial, we review for fundamental error and must first determine whether trial error exists. *State v. Escalante*, 245 Ariz. 135, 140, 142 ¶¶ 12, 21 (2018). We review evidentiary rulings that implicate the Confrontation Clause de novo. *State v. Stuebe*, 249 Ariz. 127, 130 ¶ 4 (App. 2020). "In all criminal prosecutions, the accused

shall enjoy the right . . . to be confronted with the witnesses against him[.]"
U.S. Const. amend. VI.

¶18        Earl's right to confront the other act victims was not violated.
The Confrontation Clause does not apply to the same extent at pretrial
hearings as it does at trial, *State v. Riley*, 196 Ariz. 40, 43 ¶ 7 (App. 1999); *see
also Barber v. Page*, 390 U.S. 719, 725 (1968) ("The right to confrontation is
basically a trial right.") and the right to confront one's accusers is satisfied
if defense counsel receives wide latitude to question the witnesses at trial,
*Pennsylvania v. Ritchie*, 480 U.S. 39, 53 (1987). Because Earl cross-examined
all three other act victims at trial, his right to confront the other act victims
at the pretrial hearing was not violated.

¶19        Earl argues next that the trial court erred by finding that he
had committed the other acts by clear and convincing evidence because two
of the recorded interviews were audio recordings and the trial court
therefore could not have found the other act victims credible. When a
defendant is charged with a sexual offense, evidence of other acts may be
admitted "to show that the defendant had a character trait giving rise to an
aberrant sexual propensity to commit the offense charged." Ariz. R. Evid.
404(c). The court must find, by clear and convincing evidence, that the other
act evidence is sufficient to permit the jury to find that the defendant
committed the other act and that the other act evidence provides a
reasonable basis for the jury to infer that the defendant had a character trait
giving rise to an aberrant sexual propensity to commit the charged offense.
*See* Ariz. R. Evid. 404(c)(1)(A)–(B); *see also State v. James*, 242 Ariz. 126, 131
¶ 17 (App. 2017). The court must also find that the evidentiary value of the
other act evidence is not substantially outweighed by a danger of unfair
prejudice after considering, among other things, the remoteness of the other
act, the similarity or dissimilarity of the other act, the surrounding
circumstances, and other similarities or differences. Ariz. R. Evid.
404(c)(1)(C).

¶20        The trial court properly found that the recorded interviews of
the other act victims proved by clear and convincing evidence that Earl
committed the other acts. Video and audio recorded interviews are
sufficient to prove that a defendant committed the alleged other acts. *State
v. LeBrun*, 222 Ariz. 183, 187–88 ¶¶ 13, 15–16 (App. 2009). The recorded
interviews of the other act victims were therefore sufficient for the trial
court to find that Earl committed the other acts by clear and convincing
evidence.

¶21 Earl argues that the other act evidence could not provide the jury with a reasonable basis to infer that he had a character trait giving rise to an aberrant sexual propensity to commit the charged offenses. He contends that the other act evidence was dissimilar from the charged offenses because the business relationship was different and that he knew the alleged victims for different lengths of time. He also argues that the timeframes were different because the other acts were committed in 2014, while the charged offenses were committed in 2017.

¶22 The fact that two of the other act victims were employed by Earl in a different capacity than the two victims in this case is not so dissimilar to render the other act evidence inadmissible. Both victims and all three other act victims were Earl's employees. The ages of the other act victims and the victims at trial were similar during their employment and Earl groped the other act victims' breasts or genitals, similar acts to the charged offenses here. The jury therefore had a reasonable basis to infer that he had a character trait giving rise to an aberrant sexual propensity to commit the charged offenses. That Earl knew some of the other act victims for a longer period is a small difference that does not render the other act evidence inadmissible. *See* Ariz. R. Evid. 404(c) cmt. to 1997 Amendment (Rule 404(c) "does not contemplate any bright line test of remoteness or similarity, which are solely factors to be considered under subsection (1)(c).") Further, the fact that the other acts were committed between one and three years earlier did not render them inadmissible. *See id.*; *see also State v. Van Adams*, 194 Ariz. 408, 416 ¶ 24 (1999) (remoteness goes to the weight of the evidence but generally not to its admissibility); *State v. Salazar*, 181 Ariz. 87, 92 n.5 (App. 1994) (admitting other act evidence that occurred 20 years earlier). The trial court therefore properly admitted the other act evidence under Rule 404(c).

¶23 Earl also argues that the trial court erred by admitting statements that N.A. made to Larson under Rule 803(4) because none of the statements were made for the purpose of medical diagnosis or treatment. Because Earl objected at trial, we review the admission of evidence for an abuse of discretion. *See State v. Murray*, 247 Ariz. 447, 452 ¶ 12 (App. 2019).

¶24 Hearsay is "a statement, other than one made by the declarant while testifying . . . offered in evidence to prove the truth of the matter asserted" and is generally inadmissible at trial. Ariz. R. Evid. 801(c), 802. Otherwise inadmissible hearsay may be admitted if it consists of "statements made for purposes of medical diagnosis or treatment and describing medical history, or past or present symptoms, pain, or sensations, or the inception or general character of the cause or external

source thereof insofar as reasonably pertinent to diagnosis or treatment." Ariz. R. Evid. 803(4). In determining whether a hearsay statement is "reasonably pertinent to diagnosis or treatment[,]" courts consider "whether the declarant's apparent motive [is] consistent with receiving medical care[] and [] whether it [is] reasonable for the physician to rely on the information in diagnosis or treatment." *State v. Lopez*, 217 Ariz. 433, 435 ¶ 8 (App. 2008).

¶25        N.A.'s apparent motive was consistent with receiving medical care. Larson testified that N.A.'s statement of what happened guided the exam and that she prescribed N.A. medication and gave her aftercare instructions based on her statements. Further, N.A. testified that she went to get a medical exam after speaking with police and that Larson examined her body and gave her medication. Larson therefore reasonably relied on N.A.'s statements in treating her, N.A.'s statements were reasonably pertinent to medical diagnosis, and the trial court properly admitted N.A. statements under Rule 803(4). Even if the court did err, such error was harmless because N.A.'s statements to Larson were cumulative of her testimony about Earl's conduct. *See id.* at 437 ¶ 12 n.2 (noting that admission of statements that the victim had made to a nurse was harmless because the victim testified about what the defendant had done to her in direct examination).

¶26        Earl also argues that the trial court erred by denying his motion for a judgment of acquittal because no evidence corroborated the victims' testimony, and the State presented no biological evidence. He contends that he never admitted to any wrongdoing and that the entire case was based on "he said, she said" evidence that did not rise to the level of circumstantial evidence. We review the denial of a motion for a judgment of acquittal de novo. *State v. Brock*, 248 Ariz. 583, 591 ¶ 21 (App. 2020). "[T]he relevant question is whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Id.* at 591–92 ¶ 22 (quoting *State v. West*, 226 Ariz. 559, 562 ¶ 16 (2011).

¶27        The trial court did not err by denying Earl's motion. No corroborating evidence was needed because the testimony of a single witness is sufficient. *See State v. Felix*, 234 Ariz. 118, 120–21 ¶ 10 (App. 2014) (affirming conviction based on single witness's testimony). And even though Earl denied any wrongdoing, the jury was free to find that the victims were more credible. *Id.* The victims' testimony alone was sufficient to sustain a conviction and the trial court properly denied Earl's motion.

¶28      Earl argues last that the trial court erred by allowing Detective Russo to testify about statements that Earl had made without evidence that he had first received the warnings required by *Miranda v. Arizona*, 384 U.S. 436 (1966), or that he had waived his constitutional rights. "To safeguard this privilege, law enforcement officers must provide the well-known *Miranda* warnings before interrogating a person in custody." *State v. Maciel*, 240 Ariz. 46, 49 ¶ 10 (2016). Earl never objected to Detective Russo's testimony and his police report reflects that Earl waived his *Miranda* rights before he was questioned. Therefore, the trial court did not err by allowing Detective Russo to testify about Earl's statements. Even if the court did err, Earl fails to establish prejudice because he offers only a speculative, conclusory assertion that the jury "*could have* reached a different verdict." *See State v. Martin*, 225 Ariz. 162, 166 ¶ 15 (App. 2010) ("Speculative prejudice is insufficient under fundamental error review.").

**CONCLUSION**

¶29      For the foregoing reasons, we affirm.



AMY M. WOOD • Clerk of the Court
FILED:    AA