NOTICE: NOT FOR OFFICIAL PUBLICATION.
UNDER ARIZONA RULE OF THE SUPREME COURT 111(c), THIS DECISION IS NOT PRECEDENTIAL
AND MAY BE CITED ONLY AS AUTHORIZED BY RULE.

IN THE

# ARIZONA COURT OF APPEALS
### DIVISION ONE

---

STATE OF ARIZONA, *Appellee,*

*v.*

BECKY JEAN THOMPSON, *Appellant.*

No. 1 CA-CR 24-0157
FILED 02-18-2025

---

Appeal from the Superior Court in Maricopa County
No. CR2021-132942-001
The Honorable Mark H. Brain, Judge

**AFFIRMED**

---

COUNSEL

Arizona Attorney General's Office, Phoenix
By Eric Knobloch
*Counsel for Appellee*

Law Office of Randal B. McDonald, Phoenix
By Randal Boyd McDonald
*Counsel for Appellant*

---

**MEMORANDUM DECISION**

Presiding Judge Michael S. Catlett delivered the decision of the Court, in which Judge Daniel J. Kiley and Judge David D. Weinzweig joined.

---

**C A T L E T T**, Judge:

¶1          Becky Thompson ("Thompson") appeals her convictions for burglary, aggravated assault, and assault.  She argues primarily that the superior court should have suppressed statements she made to an officer shortly after she committed her crimes, and that the court should not have permitted a witness and the prosecutor to comment at trial on her silence after police arrived.  She also raises several trial and evidentiary issues. Finding no reversible error, and in most instances no error at all, we affirm.

## FACTS AND PROCEDURAL HISTORY

¶2          After dropping his child off at school, Scott (we use a pseudonym to protect victim confidentiality) returned to his apartment in Phoenix to attend an online family-court hearing.  As he approached his apartment, he saw an individual down the hall dressed in all black and wearing a facemask.  As he entered his apartment, the individual attacked him with pepper spray and a cattle prod that made electric "cracking" sounds.  Scott fought back.  He grabbed the attacker's hand holding the cattle prod, spun and drove the attacker into the door, and began punching. After a few punches, the attacker's mask fell, and Scott heard the attacker repeatedly say, "I'm sorry."  Scott recognized the individual as Thompson, who is the maternal grandmother of Scott's child and who lived in California.

¶3          Scott wrestled Thompson to the ground and moved the cattle prod out of her reach.  He eased his grasp to give Thompson "enough room" because she asked him to let go and "she was kind of conceding." But Thompson's attack was not done.  She reached into her bag, pulled out a machete, and "swung it at" him.  After Scott managed to take the machete away from Thompson, she started to reach into her bag yet again, so he put her in a choke hold and screamed for help.  Scott then "sat on [Thompson]" until police arrived.

¶4         Two police officers responded and entered the hallway to Scott's apartment. Scott was sitting on Thompson in the middle of a doorway. Thompson's head was bleeding, and there was blood on the ground.

¶5         One officer asked what happened and Scott gave his version of events. During that exchange, Thompson said she "couldn't breathe," but the officer told her she could not get up "until the fire department got [there and] said it was okay to get up." After Scott finished explaining, the officer separated Scott and Thompson. The officer waited with Thompson for the fire department while she remained on the ground. While waiting, the officer asked Thompson if she could breathe but she did not respond.

¶6         When fire personnel arrived, they helped Thompson stand up and walk outside to a stairway where they began treating her head wound. Fire personnel bandaged Thompson's head and began testing her blood pressure. An officer asked her questions about what happened, and Thompson tried to explain why she was at the apartment. About five minutes later, the fire department transported Thompson to the hospital. While there, Thompson received treatment to "superglue[] her head shut."

¶7         The State charged Thompson with first degree burglary, aggravated assault (with the machete), and assault (with the pepper spray).

¶8         Before trial, Thompson moved to suppress statements she made at the apartment complex and the hospital. She argued those statements were involuntary because she suffered a head wound and was visibly disoriented during questioning. She also argued that statements she made at the hospital were inadmissible because they occurred during custodial interrogation without a *Miranda* warning. The superior court found Thompson's statements were voluntary, but it suppressed the statements she made at the hospital for failure give a *Miranda* warning.

¶9         The jury found Thompson guilty on all three counts. It also found aggravating circumstances for the burglary and aggravated assault convictions. The court sentenced Thompson to five years for burglary, ten years for aggravated assault, and thirty days for assault, all to run concurrently.

¶10        Thompson timely appealed. We have jurisdiction. *See* A.R.S. § 13-4033(A).

**DISCUSSION**

I.      *Miranda*

¶11        Thompson argues the State improperly commented at trial on her silence after police arrived on scene. She also argues the superior court erroneously admitted later statements because she was in *Miranda* custody and police had not yet advised her of her rights.

¶12        The Fifth Amendment privilege against self-incrimination, applicable here through the Fourteenth Amendment, "is available outside of criminal court proceedings and serves to protect persons in all settings in which their freedom of action is curtailed in any significant way from being compelled to incriminate themselves." *Miranda v. Arizona*, 384 U.S. 436, 467 (1966). "To safeguard this privilege, law enforcement officers must provide the well-known *Miranda* warnings before interrogating a person in custody." *State v. Maciel*, 240 Ariz. 46, 49 ¶ 10 (2016). Similarly, "the admission of post-custody, pre-*Miranda* silence and prosecutorial comment on such silence violate a defendant's constitutional right to remain silent." *State v. VanWinkle*, 229 Ariz. 233, 238 ¶ 20 (2012).

¶13        *Miranda* custody occurs when there is a "'formal arrest or restraint on freedom of movement' of the degree associated with a formal arrest." *State v. Cruz-Mata*, 138 Ariz. 370, 373–74 (1983) (citation omitted). But "restraint on freedom of movement alone does not establish *Miranda* custody." *Maciel*, 240 Ariz. at 49 ¶ 12. *Miranda* custody occurs when (1) there is a significant "curtailment of an individual's freedom of action" in (2) "an environment that 'presents the same inherently coercive pressures as the type of station house questioning at issue in *Miranda*.'" *Id.* (citation omitted).

¶14        A significant curtailment on the freedom of action occurs "if 'a reasonable person would have felt he or she was not at liberty to terminate the interrogation and leave.'" *Id.* at 50 ¶ 14 (citation omitted). "To determine how a suspect would have gauged his or her freedom of movement, we must evaluate 'all of the circumstances surrounding the interrogation[.]'" *Id.* (citation omitted).

¶15        "*Miranda* custody also requires an environment presenting 'inherently coercive pressures' that threaten to subjugate the individual to the examiner's will." *Id.* at ¶ 16. "Various objective factors can create an inherently coercive environment, and the [United States] Supreme Court has noted that no one factor controls." *Id.*

**¶16**        As to our standard of review, although Thompson moved to suppress statements she made to police at the hospital, she did not object to the testimony at trial about her silence at the apartment complex or move to suppress the statements she made to police there. We, therefore, review her arguments for fundamental error. *State v. Escalante*, 245 Ariz. 135, 140 ¶ 12 (2018). To succeed under that standard of review, an appellant must first establish that the superior court committed error. *Id.* at 142 ¶ 21. Next, an appellant must show that the error was fundamental because it (1) went to the foundation of the case, (2) took away an essential right necessary to demonstrate a viable defense or rebut the prosecution's case, or (3) was so egregious that he could not possibly have received a fair trial. *Id.* at 141–42 ¶¶ 18–21. Finally, if the appellant relies on prong one or two, there must be a separate showing of prejudice. *Id.* at 142 ¶ 21. "The [appellant] bears the burden of persuasion at each step." *Id.*

### A.    Thompson's Silence

**¶17**        At trial, one of Scott's neighbors testified that, before officers arrived, Thompson "was trying to say the opposite of what [Scott] was" but "once the police arrived, she just shut up and didn't say another word. Her whole demeanor changed." During closing arguments, the State said:

> This is a case of he said she didn't. If there had been another plausible explanation, you would have heard about it. There simply isn't one, and you can infer that from . . . what Mr. Davis said this morning on the stand, Ms. Thompson was sort of cowering or accusing [Scott] . . . when the witnesses in the hallway were gathered. As soon as the officers show up, quiet. Why would that be?

Thompson argues the neighbor's testimony about her silence, and the State's comment during closing argument, violated her right to remain silent during *Miranda* custody.

**¶18**        Contrary to that argument, Thompson was not in *Miranda* custody when she was silent. The neighbor's testimony focused on how Thompson's demeanor changed during the period shortly after police arrived. During that period, Thompson was in public view in the doorway of the apartment where the crime occurred. *See Maciel*, 240 Ariz. at 50 ¶ 18 ("[E]xposure to public view during questioning can dispel the danger of coercion."). She was not placed in handcuffs or told she was under arrest. One officer told Thompson to stay on the ground, but the reason for doing

so was to give officers time to assess the scene to determine what had happened and who was safe and who was not.

¶19        The interactions between the officers and Thompson were also very limited.  The officers asked Scott what happened, and he shared his version of events.  When Thompson was silent, the only interactions the officers had with her was to tell her not to get up until the fire department said it was okay and to ask if she could breathe.  The entire interaction lasted approximately five minutes before the fire department arrived and moved Thompson outside.  There is no indication the officers unreasonably delayed their investigation.  *See Maciel*, 240 Ariz. at 51 ¶ 23 ("The investigative detention here . . . lasted less than one hour.  That duration alone does not turn the encounter into a de facto arrest.").

¶20        As our supreme court has explained, "[T]he *Miranda* rule is not violated when . . . the [appellant's] silence was in response to an accusation made by a civilian unaffiliated with the police before a warning could be given, and there is no indication of any wrongdoing by the police." *VanWinkle*, 229 Ariz. at 236 ¶ 10.  Here, the time during which Thompson was silent was immediately after police arrived (i.e., before a warning could be given).  Her silence was most relevant because of the accusations Scott made against her to police, not because of accusations made by police.  And there is nothing in the record suggesting the police engaged in wrongdoing during her silence.  Because Thompson was not in *Miranda* custody when her silence occurred, the superior court did not err by allowing limited testimony and commentary about that silence.

### B.        Thompson's Statements in the Stairway

¶21        Thompson also argues the court erred in allowing testimony about statements she made to police while in the stairway of the apartment complex.  This argument—like the last—turns on whether Thompson was in custody when she made the statements.  We conclude Thompson was still not in *Miranda* custody in the stairway.

¶22        Thompson's freedom of movement was curtailed because the fire department was treating her.  The officer questioned Thompson while fire personnel assessed her pulse and blood pressure.  To the extent Thompson was unable to leave, it was because she needed medical treatment.  The questions the officer asked were investigatory, and not inculpatory, in nature.  At that point, the officer was still trying to determine why Thompson was present at the scene and what had transpired.  The officers did not place Thompson in the back of a police car or otherwise

restrain her. The stairway where the questioning occurred was outside, in public view, and a short distance from Scott's apartment.

¶23 But even if Thompson's freedom of action was significantly curtailed, she was not questioned in "an inherently coercive environment." *Maciel*, 240 Ariz. at 50 ¶ 16. Again, the officer questioned Thompson where he found her (at the apartment complex) while in public view of fire personnel and Scott's neighbors. *See id.* at 50 ¶ 18, 51 ¶¶ 21–22. The questioning, too, was "temporary and relatively nonthreatening." *Id.* at 51 ¶ 19. The officer calmly asked Thompson questions about why she was there. And the officer did not unreasonably prolong the questioning considering its purpose—to determine what had happened between Thompson and Scott and why. *See id.* at 51 ¶¶ 19, 23. The officer reasonably and efficiently questioned Thompson for approximately five minutes before fire personnel transported her to the hospital, thereby ending the questioning. Considering the totality of circumstances, Thompson was not in *Miranda* custody at the time of questioning, so the court properly admitted testimony about her statements to officers in the stairway.

## II. Voluntariness of Thompson's Statements

¶24 Thompson also argues the statements she made at the apartment were involuntary because she was seriously injured at the time. Because Thompson raised this issue in the superior court, we review for an abuse of discretion, but we review constitutional issues *de novo*. *State v. Champagne*, 247 Ariz. 116, 131 ¶ 28 (2019). We consider only the evidence presented at the suppression hearing. *State v. Peraza*, 239 Ariz. 140, 144 ¶ 4 (App. 2016). We view the evidence in the light most favorable to sustaining the superior court's ruling and defer to the court's factual findings unless clearly erroneous. *State v. Rosengren*, 199 Ariz. 112, 116 ¶ 9 (App. 2000).

¶25 Only voluntary statements made to officers are admissible. *State v. Ellison*, 213 Ariz. 116, 127 ¶ 30 (2006). For a statement to be involuntary, "we must find both coercive police behavior and a causal relation between the coercive behavior and the defendant's overborne will." *State v. Boggs*, 218 Ariz. 325, 336 ¶ 44 (2008). We review the totality of the circumstances to determine whether the defendant's will was overborne. *State v. Newell*, 212 Ariz. 389, 399 ¶ 39 (2006).

¶26 The superior court found Thompson had a head wound that was bleeding when officers first arrived. While being treated by fire personnel, a police officer asked her questions. The fire department then transported her to the hospital, where she received treatment to

"superglue[] her head shut." The court found that the officers did not "badger or threaten" Thompson, did not make any promises, and there was "no indication of any coercive police behavior."

¶27    Relying on *Mincey v. Arizona*, 437 U.S. 385 (1978), Thompson argues the statements she made were involuntary because she made them "in the course of medical treatment." Thompson's reliance on *Mincey* is misplaced. In that case, after police shot Mincey during a shootout, an officer questioned him at the hospital, where tubes and a catheter were inserted, and when he could only respond in writing. *Id.* at 396. Mincey complained the pain was "unbearable" and some of his answers were "on their face not entirely coherent." *Id.* at 398–99. Officers read Mincey his *Miranda* rights, and he asked for a lawyer, but the officers ignored that request and continued to interrogate him "relentlessly" for hours, ceasing only when he "lost consciousness or received medical treatment[.]" *Id.* at 399–401. The United States Supreme Court held that Mincey's statements were involuntary because, although it was clear he did not want to answer questions, he was "weakened by pain and shock, isolated from family, friends, and legal counsel, and barely conscious[.]" *Id.* at 401–02.

¶28    *Mincey* is distinguishable. To start, Mincey was questioned while being treated at the hospital; Thompson was questioned while sitting outside on a staircase at an apartment complex. Nothing restricted Thompson's ability to speak and she was not in and out of consciousness. Unlike *Mincey*, the superior court here found that the officer did not "badger or threaten" Thompson, did not make any promises, and there was "no indication of any coercive police behavior." Also unlike *Mincey*, the questioning here took minutes, not hours, and Thompson never asked to end the questioning. Lastly, although Thompson was injured and bleeding, the court found there was no evidence of a medical diagnosis of a head wound that would render any statements involuntary. The superior court did not commit clear error in making any of its factual findings, and those findings adequately support that Thompson's statements to the officer at the apartment complex were voluntary.

## III.    References to "the Victim"

¶29    Thompson argues the court abused its discretion by not requiring the State and its witnesses to refer to Scott as the "alleged victim." Thompson cites *Z.W. v. Foster* to argue that using the verbiage "alleged victim" is the proper way to refer to the victim in cases where the core issue in dispute is whether any crime occurred. *See* 244 Ariz. 478, 480 ¶ 7 (App. 2018). But Thompson acknowledges that "*Z.W.* did not hand down a

mandate regarding how [superior] courts ought to refer to victims[.]" Rather, "the superior court retains discretion to assess—on a case-by-case basis—whether a particular reference to a victim undermines the victim's right to be treated with fairness, respect, and dignity under the particular circumstances presented." *Id.*

**¶30**        So, while *Z.W.* allows superior courts to mandate use of the phrase "alleged victim," it also grants them discretion to allow use of the term "victim."  The only limit on that discretion is when "the defendant has only challenged *who* committed the crime," in which case using "victim" is required and using "alleged victim" is impermissible.  *See id.*  This is not a case where the only issue is who committed the crime—Thompson challenged whether a crime occurred at all against Scott.  So, here, the court could decide whether to mandate use of the phrase "alleged victim."

**¶31**        The superior court did not abuse its wide discretion and it did not violate Thompson's due process rights.  At trial, the court permitted Thompson to argue, repeatedly, that she was the victim, and the court itself referred to Scott as the "alleged victim."  The court also instructed the jury that Thompson was "presumed by law to be innocent," the jury "must not think [she] is guilty just because of a charge," and the State "must prove each element of each charge beyond a reasonable doubt."  We are confident the jury was not tricked or misled into convicting Thompson merely because the State and certain witnesses called Scott the victim.

## IV.    Testimony about the Cattle Prod

**¶32**        Thompson argues the court erred in denying her motion to exclude mention of the cattle prod because her use of it was not the basis for any of the State's charges against her.  We review the superior court's decision on the admissibility of evidence for an abuse of discretion.  *State v. Forde*, 233 Ariz. 543, 559 ¶ 42 (2014).  We review legal conclusions *de novo*.  *Newell*, 212 Ariz. at 397 ¶ 27.  We will affirm the court's decision to admit evidence if there is "any reasonable evidence in the record to sustain it."  *State v. Butler*, 230 Ariz. 465, 472 ¶ 28 (App. 2012) (citation omitted).

**¶33**        Thompson argues evidence about the cattle prod should have been treated as "other acts" evidence under Arizona Rule of Evidence 404(b).  Rule 404(b) prohibits admission of "other crimes, wrongs, or acts . . . to prove the character of a person in order to show action in conformity with."  But intrinsic evidence that "may prevent a witness from explaining the charged act, making the witness' testimony confusing or incoherent," is exempt from Rule 404(b).  *State v. Ferrero*, 229 Ariz. 239, 242 ¶ 14 (2012).

¶34        Evidence is "intrinsic" if "(1) it directly proves the charged act, or (2) is performed contemporaneously with and directly facilitates commission of the charged act." *Id.* at 243 ¶ 20. "Evidence that . . . is 'part and parcel' of the charged act may well qualify as intrinsic evidence, but . . . [that test is] broader than" the proper intrinsic evidence test and should not be used when analyzing whether evidence is intrinsic. *Id.* n.4.

¶35        In admitting evidence about the cattle prod, the court concluded that evidence was intrinsic because it was "just part and parcel of these series of events . . . that we're talking about, even though it wasn't charged." While the court's use of the "part and parcel" nomenclature, instead of applying the *Ferrero* formulation, may have technically been error, s*ee id.*, such error was harmless. *State v. Riley*, 248 Ariz. 154, 176 ¶ 68 (2020) (harmless error means "the error did not contribute to or affect the verdict or sentence" (citations omitted)).

¶36        Even properly analyzing the cattle prod evidence under the *Ferrero* formulation, that evidence was intrinsic and admissible. The second *Ferrero* exemption applies here—the State presented evidence that Thompson used the cattle prod simultaneously with, and to facilitate, the other charged acts. *Ferrero* acknowledged that evidence that is "part and parcel" of a charged act still "may well qualify as intrinsic evidence," even if its formulation was narrower. 229 Ariz. at 243 ¶ 20 n.4. And that is the case with Thompson's attack. The State presented evidence that Thompson used the cattle prod while committing assault with pepper spray to gain entry to Scott's apartment. When her first-wave attack was unsuccessful, she immediately committed aggravated assault with the machete. The court did not abuse its discretion in allowing testimony about the cattle prod as intrinsic to the crimes charged. *Butler*, 230 Ariz. at 472 ¶ 28

¶37        Thompson also argues *State v. Kelly*, 257 Ariz. 101, ___ ¶ 22 (App. 2024), requires the State to "be more specific about proving charges" and, by not charging the cattle prod, the State rendered testimony about it "irrelevant." *Kelly*, however, analyzed whether multiple counts of aggravated assault are multiplicitous in violation of the Double Jeopardy Clause. *Id.* at ___ ¶¶ 6–8. Thompson does not argue Double Jeopardy, so *Kelly* is inapposite. The testimony about the cattle prod was intrinsic to the charged crimes and relevant to understanding their commission.

## V.    Aggravating Circumstance

¶38        The jury found an aggravating circumstance for Thompson's aggravated assault conviction because Scott suffered physical, emotional,

or financial harm from that crime. Thompson argues there was insufficient evidence to support that aggravating circumstance.

¶39        "[T]he court must enter a judgment that an aggravating circumstance . . . was not proven if there is no substantial evidence to support the allegation." Ariz. R. Crim. P. 20(a)(2). We review whether the record contains sufficient evidence *de novo*. *State v. West*, 226 Ariz. 559, 562 ¶ 15 (2011). Substantial evidence is "such proof that reasonable persons could accept as adequate and sufficient to support a conclusion of defendant's guilt beyond a reasonable doubt." *State v. Pena*, 209 Ariz. 503, 505 ¶ 7 (App. 2005) (internal quotation marks and citation omitted). There is sufficient evidence if, after viewing the evidence in the light most favorable to sustaining the verdict, "*any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *State v. Parker*, 231 Ariz. 391, 407 ¶ 70 (2013) (citation omitted).

¶40        An aggravating circumstance exists if a victim "suffered physical, emotional or financial harm." A.R.S. § 13-701(D)(9). Thompson focuses on the physical harm component. But the term "or" allows any of the three types of harm to support the aggravated circumstance. *See State v. Stokley*, 182 Ariz. 505, 517 (1995) (holding the use of "or" in an aggravating circumstance means "if any one of the three factors is found, the circumstance is satisfied").

¶41        Scott broke his hand during Thompson's assault. Scott also testified that he "thought [he] was fighting for [his] life" when he saw the machete. Multiple neighbors corroborated Scott's account by testifying they heard a male voice screaming for help because someone was "trying to kill" him, and one neighbor testified Scott yelled "she has a machete." Afterwards, Scott received medical care for his hand. This was sufficient evidence for the jury to find that Scott suffered physical, emotional, or financial harm stemming from Thompson's aggravated assault.

¶42        Thompson cites *State v. Alvarez* to argue that the State cannot use an element of a crime to aggravate the same crime. 205 Ariz. 110, 115 ¶ 16 (App. 2003) (holding the court "must point to conduct that somehow exceeds the elements or aggravates the circumstances of the offense"). But *Alvarez* does not help her. Thompson traveled from California to Arizona, disguised her identity, laid in wait for Scott to arrive at his apartment, and then attacked him with a machete. In the ensuing melee, Scott suffered a broken hand, which required him to obtain medical care. This evidence sufficiently supports that Scott suffered physical, emotional, or financial harm from Thompson's attack, none of which is required to prove

aggravated assault. *See id.* at ¶ 8 ("*[A]ny* pecuniary damage to the victim's family caused by a defendant will support a finding of financial harm under A.R.S. § 13–701(D)(9)."); *see also State v. Coulter*, 236 Ariz. 270, 274 ¶ 7 (App. 2014) (explaining that emotional harm under § 13-701(D)(9) includes "fright, fear, sadness, sorrow, despondency, anxiety, humiliation, depression (and other mental illnesses), and a host of other detrimental — from mildly unpleasant to disabling — mental conditions.").

## VI.    Victim-Impact Statement

**¶43**        Finally, Thompson argues the court abused its discretion by allowing Scott to give a "wide-ranging" victim-impact statement that included "uncharged, unsubstantiated, [and] irrelevant conduct[.]"

**¶44**        Arizona's Constitution grants a crime victim the right "[t]o be heard at any proceeding involving . . . sentencing." Ariz. Const. art. 2, § 2.1(A)(4). Generally, Arizona permits a broad range of "emotional" impact statements. *See State v. Strong*, ___ Ariz. ___, 555 P.3d 537, 569 ¶ 150 (2024); *see also State v. Bush*, 244 Ariz. 575, 594 ¶ 82 (2018). But it is possible for a victim-impact statement to become "so unduly prejudicial that it renders the trial fundamentally unfair." *State v. Dann*, 220 Ariz. 351, 369 ¶ 98 (2009) (quoting *Payne v. Tennessee*, 501 U.S. 808, 825 (1991)).

**¶45**        That did not happen here. As the State points out, many of Scott's statements were made in response to positions Thompson took in her sentencing memorandum. But even if Scott went too far, Thompson has not demonstrated prejudice. A judge, not a jury, heard the impact statement and imposed the sentence. "[W]e have generally assumed that the sentencing judge is capable of focusing on the relevant factors and setting aside the irrelevant, inflammatory, and emotional factors, absent evidence to the contrary." *State v. Spears*, 184 Ariz. 277, 292 (1996). In listing the aggravating factors for sentencing purposes, the court mentioned only "harm to the victim" and that Thompson drove "400 miles, having brought equipment to cover [her] face, shield [her] identity, showing up with a machete[.]" There is no evidence that the court relied on the details Scott included in his victim-impact statement. So, even assuming error in allowing Scott's statements, there was no prejudice.

## CONCLUSION

¶46       We affirm Thompson's convictions and sentences.

