NOTICE: NOT FOR OFFICIAL PUBLICATION.
UNDER ARIZONA RULE OF THE SUPREME COURT 111(c), THIS DECISION IS NOT PRECEDENTIAL
AND MAY BE CITED ONLY AS AUTHORIZED BY RULE.

IN THE

# ARIZONA COURT OF APPEALS
## DIVISION ONE

STATE OF ARIZONA, *Appellee*,

*v.*

YOGE SHWAR, *Appellant*.

No. 1 CA-CR 23-0229
FILED 5-7-2024

Appeal from the Superior Court in Mohave County
No. S8015CR202200757
The Honorable Billy K. Sipe, Jr., Judge *Pro Tempore*

**AFFIRMED**

COUNSEL

Arizona Attorney General's Office, Phoenix
By Joshua C. Smith
*Counsel for Appellee*

Jill L. Evans, Attorney at Law, Flagstaff
By Jill L. Evans
*Counsel for Appellant*

_____

**MEMORANDUM DECISION**

Presiding Judge Daniel J. Kiley delivered the decision of the Court, in which Judge Kent E. Cattani and Judge D. Steven Williams joined.

_____

**K I L E Y**, Judge:

¶1        A jury convicted Yoge Shwar of transporting a narcotic drug for sale. He now appeals, asserting that the evidence at trial was obtained in violation of his constitutional rights and, in any event, was insufficient to support his conviction. We affirm.

## FACTS AND PROCEDURAL HISTORY

¶2        Viewed in the light most favorable to sustaining the verdict, *see State v. Thompson*, 252 Ariz. 279, 287, ¶ 2 n.3 (2022), the evidence establishes that while patrolling Interstate 40 in the early morning hours of June 29, 2022, Detective Dickinson, a 15-year veteran of the Arizona Department of Public Safety who was then serving in the K-9 unit, initiated a traffic stop after seeing a semi-trailer truck drift across the white "fog line" twice. While speaking with the driver, Kewal Garg, he saw another person, later identified as Shwar, in the sleeper compartment behind the cab.

¶3        Dickinson noticed that Garg's "hands were trembling" when he handed over his license, registration, and proof of insurance. When Dickinson pointed out that Garg was "shaking like a leaf" and asked if he suffered from multiple sclerosis or "some type of nerve issue," Garg replied that he is diabetic but "felt fine."

¶4        While issuing Garg a warning, Dickinson noticed that Garg kept "licking his lips and . . . the top row of his teeth," a behavior that Dickinson had previously seen in individuals "under the influence of stimulants." He also noticed Garg's "eyelids . . . flutter[ing]" when he closed his eyes. Dickinson, whose investigative training included drug recognition courses, later testified that eyelid tremors are indicative of being "under the influence of a stimulant drug" or "marijuana." He further testified that, in his experience, commercial drivers often use "illegal drugs to stay awake" while driving. Dickinson asked Garg whether he was "using something to stay awake"; Garg replied that he was not.

¶5          Based on the indicators of impairment he observed, Dickinson initiated a driving under the influence ("DUI") investigation by asking Garg to submit to a "walk and turn" field sobriety test ("FST"). As Dickinson later described it, the test requires the subject to "take nine heel-to-toe steps" in a straight line and then turn and walk back in the same manner while counting out loud. Garg performed "poorly" on the test; among other things, he "didn't count out loud" and "turned improperly." Dickinson later acknowledged, however, that his interaction with Garg was hampered by a language barrier; Garg's accent made it difficult for Dickinson to understand him, and Garg didn't appear to understand everything Dickinson said.

¶6          Accordingly, Dickinson approached the truck to talk with Shwar to find out what was going on with the driver. Meanwhile, a Drug Enforcement Administration ("DEA") agent who had arrived to assist with the traffic stop stayed with Garg.

¶7          Dickinson's conversation with Shwar was captured by his body-worn camera. As relevant here, Shwar explained that he and Garg were transporting a load of potatoes from Bakersfield, California to Cincinnati, Ohio. Dickinson noted that Garg was "jacked up" and asked Shwar if Garg had "any medical conditions." Shwar stated that Garg is diabetic and takes cholesterol medication but identified no other medical condition that might account for the physical signs of impairment that Dickinson observed.

¶8          Dickinson told Shwar to get out of the truck. Shwar complied. Believing that Garg was under the influence of a stimulant and that evidence of the drug he was using would be in the vehicle, Dickinson asked if there was cocaine or methamphetamine in the vehicle. Pointing toward the trailer, Shwar responded, "No, sir. You can check it." Dickinson clarified, "So I may check? May I search? . . . Truck and trailer?" Shwar replied that he could search the trailer but not the truck. Dickinson then returned to Garg, who was standing by the patrol car, to ask for permission to search the entire vehicle. Garg replied that Dickinson could search "anything."

¶9          Dickinson removed his narcotics detection canine, Turbo, from his patrol car to conduct an exterior sniff of the truck and trailer. Less than one minute later, Turbo alerted to the open passenger door. Turbo's alert occurred less than four minutes after Dickinson finished speaking with Shwar.

¶10          After Turbo alerted, Dickinson searched the cab and found four matching boxes in the sleeper berth, each bearing a prepaid U.S. Postal Service ("USPS") label for shipment from Los Angeles, California to Memphis, Tennessee. Dickinson opened one of the boxes and saw several plastic wrapped bundles that he believed, based on his training and experience, were "packages with bulk drugs."

¶11          Dickinson got out of the cab and asked Shwar about the boxes. Shwar said he was unaware of their contents and that he and Garg were transporting the boxes to a "guy" in Ohio as a "favor" for an unnamed "friend" of Garg's son. He explained that they had picked the boxes up in Hesperia, California. Dickinson found this answer strange because Hesperia is not on the route between Bakersfield and the location of the traffic stop. On the contrary, Dickinson later testified, driving to Hesperia would have added roughly an hour and a half of travel time to the trip. Dickinson also testified that such a detour would be unusual for commercial drivers, who are incentivized to take the fastest route to their destination.

¶12          At this point, about 35 minutes into the stop, both Shwar and Garg were arrested and transported to the Mohave Area General Narcotics Enforcement Team ("MAGNET") office in Kingman; the boxes were also taken to the MAGNET office. Upon opening the boxes, officers found 105 individually wrapped kilogram bricks of what appeared to be cocaine. Subsequent laboratory testing revealed that the bricks contained about 230 pounds of cocaine, with approximate wholesale and resale values of $3 million and $7 million, respectively.

¶13          At the MAGNET office, Detective Wyma, along with the DEA agent, interviewed Shwar. Footage of the interview, which was admitted at trial, shows that after Wyma advised Shwar of his *Miranda* rights,[1] Shwar indicated that he did not fully understand. Wyma then repeated the advisement more slowly, and Shwar indicated that he understood. During the ensuing questioning, which lasted less than 20 minutes, Shwar reiterated that he and Garg were transporting the boxes as a favor for Garg's son's friend "Harry," explaining that they picked up the boxes in Hesperia from two men who knew Harry and were planning to give the boxes to an unnamed friend of Harry's somewhere along their route, at a location yet to be determined. Shwar further stated that he believed the boxes contained

---

[1] *See Miranda v. Arizona*, 384 U.S. 436 (1966).

auto parts. He also insisted that this was the first time they had transported boxes for Harry and that they did not receive payment for doing so.

¶14        Shwar stated that, even though he was not acquainted with Harry, he spoke with him by phone "a couple of times" because Garg's poor hearing made communicating by phone difficult. Stating that Harry's phone number was saved in his contacts, Shwar provided his iPhone passcode. A subsequent warrant search of Shwar's phone revealed nineteen calls, both incoming and outgoing, between Shwar and a contact listed as "Harry" from June 26, 2022 to June 29, 2022.

¶15        A Mohave County grand jury indicted Shwar for transportation of narcotic drugs for sale, a class 2 felony in violation of A.R.S. § 13-3408(A)(7). The State later filed an allegation that the aggregate amount of narcotics involved exceeded the statutory threshold amount under A.R.S. §§ 13-3401(36), -3420. The State also alleged two aggravating circumstances under A.R.S. § 13-701(D): the presence of an accomplice and that Shwar committed the crime "as consideration for the receipt, or in the expectation of the receipt, of anything of pecuniary value." *See* A.R.S. § 13-701(D)(4), (6).

¶16        Before trial, Shwar moved to suppress the cocaine found in the truck and the statements he made (1) during the traffic stop, after Dickinson searched the sleeper compartment, and (2) during his post-arrest interview. After briefing and an evidentiary hearing, the court denied Shwar's motions.

¶17        A jury subsequently found Shwar guilty as charged. After an aggravation hearing, the jury found that the State had proven both the presence of an accomplice and that Shwar committed the offense "as consideration for the receipt, or in the expectation of the receipt, of anything of pecuniary value." *See* A.R.S. § 13-701(D)(4), (6). The superior court sentenced Shwar to eight years' imprisonment.

¶18        Shwar timely appealed. We have jurisdiction. Ariz. Const. art. 6, § 9; A.R.S. §§ 12-120.21(A)(1), 13-4031, 13-4033(A)(1).

## DISCUSSION

¶19        We review the trial judge's evidentiary rulings for an abuse of discretion, "considering only the evidence presented at the suppression hearing and viewing it in the light most favorable to sustaining the trial court's ruling." *Thompson*, 252 Ariz. at 290, ¶ 26 (citation omitted).

5

**A.    The record supports the denial of Shwar's motion to suppress the contraband obtained as a result of the search.**

**¶20**        Shwar contends that the superior court abused its discretion by denying his motions to suppress the cocaine found in the truck because the search was "based on an illegal detention which lasted beyond the purpose of the traffic stop without reasonable suspicion or consent."

**¶21**        The Fourth Amendment of the United States Constitution "protects against unreasonable searches and seizures," and "[a]n investigatory traffic stop is a seizure under the Fourth Amendment." *State v. Majalca*, 251 Ariz. 325, 328, ¶ 12 (App. 2021).[2] Because an investigatory traffic stop "is brief and limited in nature, an officer need only possess an articulable, reasonable suspicion, based on the totality of the circumstances, that a traffic violation has occurred." *Id.* (cleaned up). "An officer who has observed a traffic violation has reasonable suspicion to initiate a traffic stop." *Id.*

**¶22**        The permissible duration of a traffic stop "is generally limited by the time required for an officer to address the reason that necessitated the stop." *Id.* at ¶ 13.

> After the original purpose of the stop has been resolved, the officer must permit the driver to leave without further delay or questioning unless: (1) the encounter between the officer and the driver ceases to be a detention, but becomes consensual, or (2) during the traffic stop the officer gains a reasonable and articulable suspicion that the driver is engaged in illegal activity.

*State v. Angulo-Chavez*, 247 Ariz. 255, 258, ¶ 7 (App. 2019) (cleaned up). Police officers may not "involuntarily detain individuals even momentarily without reasonable, objective grounds for doing so." *State v. Serna*, 235 Ariz. 270, 273, ¶ 12 (2014) (cleaned up).

---

[2] In his briefing, Shwar cites Article 2, Section 8 of the Arizona Constitution, as well as the Fourth and Fourteenth Amendments to the United States Constitution. He does not assert, however, that the scope of the protections offered by the Arizona Constitution differ from those of the United States Constitution. For purposes of this appeal, therefore, we rely only on Fourth Amendment jurisprudence in addressing Shwar's challenge to the denial of his suppression motion. *See State v. Jean*, 243 Ariz. 331, 341-42, ¶ 39 (2018).

**¶23**        Shwar does not dispute the validity of the initial traffic stop, and the State does not dispute that Dickinson prolonged the detention beyond the initial purpose of the traffic stop by initiating a DUI investigation. Whether Dickinson violated Shwar's Fourth Amendment rights by extending the traffic stop to conduct the DUI investigation turns on whether the extension was supported by reasonable suspicion of criminal activity. *See Angulo-Chavez*, 247 Ariz. at 258, ¶ 7.

### 1.    Reasonable suspicion that Garg was impaired justified extending the traffic stop to conduct a DUI investigation.

**¶24**        Shwar contends that Dickinson "lacked independent reasonable suspicion to extend" the initial traffic stop to investigate Garg "for [DUI] and possession of intoxicating drugs."

**¶25**        "We undertake a two-step inquiry to determine the constitutionality of an investigative detention." *State v. Teagle*, 217 Ariz. 17, 24, ¶ 27 (App. 2007). "First, we must decide whether the police officer's action was justified at its inception." *Id.* "Second, we consider whether the action was reasonably related in scope to the circumstances that justified the interference in the first place." *Id.* "It is the State's burden to demonstrate that the seizure it seeks to justify on the basis of a reasonable suspicion was sufficiently limited in scope and duration to satisfy the conditions of an investigative seizure." *Florida v. Royer*, 460 U.S. 491, 500 (1983).

**¶26**        Only reasonable suspicion of the driver's impairment is required to extend a traffic stop to conduct a DUI investigation. *See Devlin v. Browning*, 249 Ariz. 143, 149-50, ¶ 18 (App. 2020). "Although 'reasonable suspicion' must be more than an inchoate 'hunch,' the Fourth Amendment only requires that police articulate some minimal, objective justification for an investigatory detention." *Teagle*, 217 Ariz. at 23, ¶ 25. "In determining whether a police officer had a reasonable suspicion, a court cannot parse out each individual factor, categorize it as potentially innocent, and reject it." *Id.* at 24, ¶ 25 (cleaned up). Instead, the court must examine all of the factors as a whole. *Id.* Further, we must "accord deference to a trained law enforcement officer's ability to distinguish between innocent and suspicious actions." *Id.* at ¶ 26. "[W]hether reasonable suspicion exists is a mixed question of law and fact that we review de novo." *Majalca*, 251 Ariz. at 328, ¶ 11.

¶27         Here, the superior court found that after conducting a lawful vehicle stop upon observing a traffic violation, Dickinson was justified in prolonging the detention pending further investigation to confirm or dispel his suspicion that Garg was impaired. Based on Dickinson's observations of the traffic violation, Garg's trembling hands and eyelid tremors, and Garg's actions in "licking his lips and his teeth," the court found that "reasonable suspicion existed to believe that [Garg] was under the influence of drugs." As the encounter evolved, Garg's poor performance on the FST provided additional justification for continuing the DUI investigation by questioning Shwar about Garg's possible impairment. Ample evidence supports the court's finding that Dickinson had reasonable suspicion that Garg was impaired.

¶28         Shwar challenges the veracity of portions of Dickinson's testimony, arguing that the body-camera footage refutes his testimony that Garg was visibly "shaking" and that neither he nor Garg appeared nervous.

¶29         Although we will not second-guess the superior court's credibility determinations, we may conduct an "independent review" of video evidence. *State v. Sweeney*, 224 Ariz. 107, 111, ¶ 12 (App. 2010). Here, however, our review of Dickinson's body-worn camera footage adds little to the analysis. Although the audio from the footage is consistent with Dickinson's account of his conversations with Garg, the video is largely inconclusive. For most of their conversation, Garg cannot be seen because Dickinson's camera was directed inside the empty patrol car while he stood by the open door filling out the warning citation. But since nothing in the footage conflicts with the court's findings, we defer to the court's decision to credit Dickinson's testimony about the symptoms of impairment that Garg exhibited. *See Thompson*, 252 Ariz. at 291-92, ¶ 34.

¶30         Arguing that the circumstances were not sufficient to support a reasonable suspicion of criminal activity, Shwar offers a series of benign explanations for each of Garg's behaviors. Garg's "shaking," he argues, could be attributed to his diabetes, while he may have licked his teeth and lips simply because "the desert" is "hot . . . that time of year." Likewise, Shwar goes on, Garg's failure to follow Dickinson's instructions when performing the walk-and-turn test may have been attributable to Garg's "language difficulties."

¶31         Even if each of Garg's behaviors had a possible innocent explanation, they were nonetheless factors that collectively gave rise to a reasonable suspicion of Garg's impairment. *See Devlin*, 249 Ariz. at 148, ¶ 13 ("It is well established that the existence of possible innocent explanations

does not obviate a reasonable suspicion based on articulable facts."). Thus, the alternative explanations that Shwar posits are relevant only to the extent they made Dickinson's suspicion of Garg's impairment unreasonable, and we cannot say that they do. We affirm the court's determination that reasonable suspicion that Garg was impaired justified prolonging the traffic stop to conduct a DUI investigation.

### 2. The dog sniff was justified as part of the ongoing DUI investigation.

¶32 Shwar argues that Dickinson violated his Fourth Amendment rights when he prolonged the detention by "request[ing] consent to search" the vehicle and then conducting the dog sniff. In response, the State argues that once Shwar consented to a search of the trailer, "the encounter became . . . consensual . . . and reasonable suspicion was no longer necessary to justify the continued detention." The State contends that although Shwar, unlike Garg, did not consent to a search of the entire vehicle, he agreed to a search of the trailer and thus necessarily consented to prolonging the stop until that search could be completed.

¶33 If a traffic stop transforms into a consensual encounter, the Fourth Amendment is no longer implicated. *See Teagle*, 217 Ariz. at 23, ¶¶ 22-23. Whether an encounter is consensual "depends on the totality of the circumstances and whether a reasonable person under those circumstances would have felt free to leave." *State v. Childress*, 222 Ariz. 334, 338, ¶ 11 (App. 2009).

¶34 Here, the record does not indicate that Shwar was free to leave when he consented to a search of the trailer. Garg, the vehicle's driver, was the subject of an ongoing DUI investigation. A reasonable person in Shwar's position as the vehicle's passenger would not have felt free to leave. *See Arizona v. Johnson*, 555 U.S. 323, 333 (2009) ("[A] traffic stop of a car communicates to a reasonable passenger that he or she is not free to terminate the encounter with the police and move about at will."); *see also Brendlin v. California*, 551 U.S. 249, 257 (2007) ("[E]ven when the wrongdoing is only bad driving, the passenger will expect to be subject to some scrutiny, and his attempt to leave the scene would be so obviously likely to prompt an objection from the officer that no passenger would feel free to leave in the first place."). Before Shwar agreed to a search of the trailer, nothing had occurred that would have conveyed to him that the "traffic stop had ended or that he was otherwise free to depart without police permission." *Johnson*, 555 U.S. at 333-34 (cleaned up). In fact, Dickinson's instruction to Shwar to exit the cab made clear to Shwar that his freedom of movement was still

curtailed. *See Childress*, 222 Ariz. at 338-39, ¶¶ 12-13 (finding that officer's "command" that defendant move his truck was a "show of authority" and, because defendant "submitted to that authority," the encounter was nonconsensual). Under these circumstances, Shwar's consent to a search of the trailer did not, on its own, transform the ongoing investigative detention into a consensual encounter outside the scope of the Fourth Amendment's protections.

¶35        Nonetheless, the dog sniff did not result in an unconstitutional detention because the DUI investigation of Garg was ongoing at the time. The court found that Dickinson reasonably suspected that "the drugs [Garg] would have consumed would be in the cab of the commercial vehicle," and so did not act unreasonably by deploying Turbo to determine if there was "evidence of drug use" in the cab. The dog sniff was undertaken as part of Dickinson's efforts to confirm or dispel his suspicion that Garg was impaired, and so did not prolong the DUI investigation. *Cf. Majalca*, 251 Ariz. at 329, ¶ 14 (holding that whether dog sniff conducted during a traffic stop violated motorist's Fourth Amendment rights depends on whether the dog sniff "prolongs—*i.e.*, adds time to—the stop") (cleaned up). The prompt and brief dog sniff of the exterior of the vehicle, conducted as part of an ongoing DUI investigation supported by reasonable suspicion that the driver was impaired, did not transform the lawful temporary detention of the passenger into an unconstitutional seizure. *See generally Rodriguez v. United States*, 575 U.S. 348, 358 (2015) (whether a dog sniff performed after completion of lawful traffic stop violated Fourth Amendment's proscription of unreasonable seizures turned on "whether reasonable suspicion of criminal activity justified detaining [defendant] beyond completion of the traffic infraction investigation").

### 3.        The warrantless search of the truck was permissible under the "automobile exception."

¶36        Shwar argues that the warrantless search of the truck's cab violated the Fourth Amendment because law enforcement lacked "valid consent" or "probable cause to believe it contain[ed] contraband or other evidence of a crime."

¶37        "Warrantless searches are generally unconstitutional, subject to a few exceptions." *Thompson*, 252 Ariz. at 291, ¶ 31. One long recognized exception to the warrant requirement is the so-called "automobile exception," which "allows the warrantless search of an automobile, including containers within, provided an officer has probable cause to

believe contraband or evidence will be found." *State v. Cheatham*, 240 Ariz. 1, 2-3, ¶¶ 7-8 (2016). We review *de novo* the superior court's conclusions regarding whether a search "complied with the dictates of the Fourth Amendment." *State v. Valle*, 196 Ariz. 324, 326, ¶ 6 (App. 2000).

**¶38** "Probable cause exists if the facts available to the officer" would lead a reasonable person to believe "that contraband or evidence of a crime is present." *Thompson*, 252 Ariz. at 291, ¶ 31. "The facts need not show it is more likely than not that contraband or evidence of a crime will be found." *State v. Sisco*, 239 Ariz. 532, 535, ¶ 8 (2016). If the State produces "proof from controlled settings that a dog performs reliably in detecting drugs," *Florida v. Harris*, 568 U.S. 237, 248 (2013), an alert by the dog outside a vehicle may provide probable cause to search the entire vehicle, *State v. Weinstein*, 190 Ariz. 306, 310-11 (App. 1997).[3]

**¶39** Here, the State produced evidence at the suppression hearing that Turbo was certified in narcotic detection, regularly underwent continued training, and performed well during his re-certification test less than six months before the traffic stop in this case. This evidence supports the superior court's finding that Turbo was reliable. Dickinson testified that Turbo was "trained to alert by sitting with a focused stare," and the body-camera footage showed Turbo alerting in this manner to the open door of the truck's cab. This evidence supported the superior court's finding that Turbo alerted to the cab, which in turn provided probable cause to search it. *See Weinstein*, 190 Ariz. at 310-11; *see also Arizona v. Gant*, 556 U.S. 332, 347 (2009) (noting that "[i]f there is probable cause to believe a vehicle contains evidence of criminal activity," law enforcement may conduct a warrantless search of "any area of the vehicle in which the evidence might be found"). The court did not abuse its discretion by denying Shwar's motion to suppress the cocaine found in the vehicle.

### B. The record supports the court's denial of Shwar's motion to suppress his statements.

**¶40** Shwar next argues that the superior court abused its discretion by denying his motion to suppress his statements.

**¶41** *Miranda* requires the police to warn in-custody suspects of their rights to remain silent and to counsel before initiating questioning.

---

[3] A drug-detecting canine's exterior sniff of a vehicle is not itself a search and thus does not implicate the warrant requirement. *See Teagle*, 217 Ariz. at 27, ¶ 36 n.7 (citing *Illinois v. Caballes*, 543 U.S. 405, 408-09 (2005)).

*State v. Spears*, 184 Ariz. 277, 286 (1996) (citing *Miranda*, 384 U.S. at 444). Statements obtained in violation of *Miranda* "are generally inadmissible." *State v. Aldana*, 252 Ariz. 69, 72, ¶ 11 (App. 2021).

### 1. Shwar was not in custody when he was questioned at the scene.

**¶42**　　"[O]nce Dickinson found the drugs after a canine search and search of the cab," Shwar asserts, he was effectively "under arrest" and so was "entitled to *Miranda* warnings before further questioning." Because no such warnings were given, he maintains, his statements should have been suppressed.

**¶43**　　A person is considered in custody for *Miranda* purposes if the person's "freedom of action was significantly curtailed and, if so, when the environment in which [the person] was questioned presented inherently coercive pressures similar to a station house interrogation." *State v. Maciel*, 240 Ariz. 46, 50, ¶ 13 (2016). A motorist detained in a traffic stop is not generally considered to be "in custody" for *Miranda* purposes but may become so if "subjected to treatment that renders him 'in custody' for practical purposes." *Berkemer v. McCarty*, 468 U.S. 420, 440 (1984).

**¶44**　　Here, the parties agree that Shwar's freedom of movement at the roadside was significantly curtailed. The issue, then, is whether the environment at the scene presented "inherently coercive pressures similar to a station house interrogation." *Maciel*, 240 Ariz. at 50, ¶ 13; *see also Howes v. Fields*, 565 U.S. 499, 509 (2012) (noting that "[n]ot all restraints on freedom of movement amount to custody for purposes of *Miranda*," and courts must instead ask "the additional question whether the relevant environment presents the same inherently coercive pressures as the type of station house questioning at issue in *Miranda*").

**¶45**　　"Inherently coercive pressures" will be found if the questioning takes place in an environment that "threaten[s] to subjugate the [person] to the examiner's will." *Maciel*, 240 Ariz. at 50, ¶ 16. "Various objective factors can create an inherently coercive environment," including the site and duration of the questioning, the number of law enforcement officers present, *see id.* at 50-52, ¶¶ 16-19, 26, and "the presence or absence of physical restraints during the questioning," *Howes*, 565 U.S. at 509.

**¶46**　　A review of the totality of the circumstances does not support a finding that the environment in which Shwar was questioned "presented inherently coercive pressures similar to a station house interrogation." *See Maciel*, 240 Ariz. at 50, ¶ 13. The post-search questioning—which is the only

portion of the roadside encounter that Shwar challenges under *Miranda*—lasted less than three minutes and occurred in full view of the public along the side of a well-traveled highway. *See Berkemer*, 468 U.S. at 438-39 (noting that "the typical traffic stop is public, at least to some degree," and "is substantially less 'police dominated' than that surrounding the kinds of interrogation at issue" in *Miranda*). Shwar was neither handcuffed nor placed in the back of a police vehicle when questioned. He was not transported to a different location. *See Howes*, 565 U.S. at 511 (*Miranda* custody may arise where a person is "abruptly transported from the street into a police-dominated atmosphere") (cleaned up). Only two law enforcement officers were present, only one of whom asked Shwar questions. *See Berkemer*, 468 U.S. at 438 (holding that traffic stops are generally not "custody" for *Miranda* purposes in part because "the detained motorist typically is confronted by only one or at most two policemen"). Although armed, neither officer had his gun drawn. As the superior court found, Dickinson asked Shwar "only a few questions, all within the scope of the investigation," and "did not threaten force, make exaggerated displays of authority, or otherwise employ coercive tactics." *See Maciel*, 240 Ariz. at 52, ¶¶ 26-27.

¶47 The objective circumstances of Shwar's roadside questioning simply did not present the "inherently coercive pressures" indicative of custody for *Miranda* purposes. *Id.* at 51-53, ¶¶ 21-22, 26-30 (affirming denial of motion to suppress unwarned statements defendant made during "curbside questioning" at the scene of a burglary where defendant was questioned in a public setting with a "relatively modest" police presence and was not physically restrained). Accordingly, the court did not err by denying Shwar's motion to suppress statements made during his roadside questioning.

### 2. Shwar knowingly, voluntarily, and intelligently waived his *Miranda* rights at the police station.

¶48 Shwar contends that he did not knowingly and intelligently waive his rights when questioned at the MAGNET office, asserting that he had "no level of proficiency" in English and that Wyma "sped through" the *Miranda* warnings despite his "obvious[]" inability to understand what was being said.

¶49 "In order to be admissible, statements obtained while an accused is subject to custodial interrogation require a prior waiver of *Miranda* rights." *State v. Carter*, 145 Ariz. 101, 105 (1985). Under *Miranda*, a suspect must be "fully advised" that "he may choose not to talk to law

enforcement officers, to talk only with counsel present, or to discontinue talking at any time," including the "critical advice that whatever he chooses to say may be used as evidence against him." *Colorado v. Spring*, 479 U.S. 564, 574 (1987). "Answering questions after police properly give the *Miranda* warnings" may constitute "waiver by conduct." *State v. Tapia*, 159 Ariz. 284, 287 (1988). Here, it is undisputed that after Wyma read Shwar his rights twice, Shwar proceeded to answer questions. The only issue, therefore, is whether Shwar validly waived his rights. *See Miranda*, 384 U.S. at 444.

**¶50**     An unrepresented suspect's statements during custodial interrogation are generally inadmissible unless the State establishes that the suspect voluntarily, knowingly, and intelligently waived his or her rights. *See, e.g.*, *J.D.B. v. North Carolina*, 564 U.S. 261, 269-70 (2011). To be voluntary, the waiver must be "the product of a free and deliberate choice rather than intimidation, coercion, or deception." *Moran v. Burbine*, 475 U.S. 412, 421 (1986). To be knowing and intelligent, the suspect must have "a full awareness of both the nature of the right being abandoned and the consequences of the decision to abandon it." *Id.* But "[t]he Constitution does not require that a criminal suspect know and understand every possible consequence of a waiver." *Spring*, 479 U.S. at 574. Moreover, "[p]oor linguistic abilities, standing alone, do not invalidate an otherwise knowing and intelligent waiver." *State v. Klos*, 248 Ariz. 40, 44, ¶ 12 (App. 2019) (citation omitted). Instead, "to determine whether a defendant has validly waived rights," "we examine the totality of the circumstances surrounding the interrogation," *id.* (cleaned up), including "the defendant's background, experience and conduct," *State v. Montes*, 136 Ariz. 491, 495 (1983).

**¶51**     The record supports the superior court's determination that Shwar validly waived his *Miranda* rights. Before beginning the interview, Wyma asked Shwar, "You can hear me okay, you understand me alright?" Shwar responded, "Yeah, um, like I understand 70%." Wyma then administered a *Miranda* warning and asked if Shwar understood his rights; Shwar responded, "Like, uh, I don't know. What, like, attorney? . . . What did you say? Attorney what?" He then asked Wyma to "speak slowly." Wyma then recited the *Miranda* warnings more slowly and again asked if Shwar understood his rights. Shwar responded, "Yeah." Wyma then questioned Shwar for about 20 minutes. A review of the interview footage shows Shwar giving responsive answers in English to Wyma's questions. At no point does Shwar express concern that the interview was being conducted in English. Moreover, as Dickinson testified, Shwar demonstrated proficiency in spoken English during their roadside conversations earlier that morning. Because the officers' testimony and the

recording of Shwar's interview supports the court's conclusion that Shwar's "grasp of English was sufficient to allow [him] to knowingly and intelligently waive [his] rights," *see Klos*, 248 Ariz. at 45, ¶ 13, the court did not err by denying Shwar's motion to suppress statements he made during his post-arrest interview at the MAGNET office.

### C.    Sufficient evidence supports Shwar's conviction.

**¶52**        Finally, Shwar challenges the sufficiency of the evidence to support his conviction for transporting narcotic drugs for sale, arguing that the State did not prove that he knew the boxes contained cocaine that was to be sold.

**¶53**        "A conviction will be reversed for insufficient evidence only if it is not supported by substantial evidence." *State v. Ellison*, 213 Ariz. 116, 133-34, ¶ 65 (2006). "Substantial evidence . . . is such proof that reasonable persons could accept as adequate and sufficient to support a conclusion of [the] defendant's guilt beyond a reasonable doubt." *Id.* at 134, ¶ 65 (citation omitted). "Substantial evidence must support each element of the crime charged." *State v. Rios*, 255 Ariz. 124, 130, ¶ 21 (App. 2023). "Both direct and circumstantial evidence should be considered in determining whether substantial evidence supports a conviction." *State v. West*, 226 Ariz. 559, 562, ¶ 16 (2011). "[W]hen considering whether substantial evidence exists, we resolve conflicts in the evidence against the defendant and view the facts in the light most favorable to sustaining the verdict." *Rios*, 255 Ariz. at 130, ¶ 20. The "question of sufficiency of the evidence is one of law, subject to de novo review on appeal." *West*, 226 Ariz. at 562, ¶ 15.

**¶54**        The offense charged in this case required proof that the defendant knowingly transported or transferred a narcotic drug for sale. *See* A.R.S. § 13-3408(A)(7). "[T]he State must prove, among other things, either actual physical possession or constructive possession with actual knowledge of the presence of the narcotic substance." *Teagle*, 217 Ariz. at 27, ¶ 41 (cleaned up); *see also* A.R.S. § 13-3408(A)(7). "Knowingly" means that a defendant acted with awareness of or belief that his conduct is of that nature or that the circumstances of his conduct constitute the offense. *See* A.R.S. § 13-105(10)(b).

**¶55**        Here, Shwar does not dispute that he knew the boxes were in the sleeper compartment. He argues, however, that the State did not present sufficient evidence to sustain a verdict that he knew the boxes contained drugs or that the drugs were being transported for sale. There is no evidence he ever opened the boxes; on the contrary, they were sealed when

the police found them. Citing his statements to law enforcement that he thought that they were transporting auto parts as a favor for a friend of Garg's son, he argues that the State presented no evidence to refute his explanation. Moreover, Shwar asserts, his belief was "reasonable" considering the boxes' weight and lack of odor.

¶56        Although the jury could have chosen to credit Shwar's explanation, "[t]he jury is not compelled to accept the story . . . of an interested party." *State v. Pieck*, 111 Ariz. 318, 320 (1974). Moreover, "we may not reverse a conviction for insufficiency of the evidence simply because another jury might have reached a different verdict." *Rios*, 255 Ariz. at 131, ¶ 26. Instead, "[i]f reasonable persons may fairly differ as to whether certain evidence establishes a fact in issue, then such evidence must be considered as substantial." *State v. Saez*, 173 Ariz. 624, 628 (App. 1992) (cleaned up).

¶57        The jury heard evidence that Shwar and Garg picked up the boxes in Hesperia, a detour that added about 90 minutes to their travel time. A reasonable juror could infer that Shwar and Garg undertook this detour in the expectation of payment or other personal gain and not merely, as Shwar claimed, as a favor to a stranger. There were 19 calls between Shwar's phone and Harry's phone between June 26 and 29, refuting Shwar's statement to Wyma that they spoke only "a couple of times." When questioned at the MAGNET office, Shwar expressed uncertainty about Harry's name, even though Harry's name was saved as a contact in Shwar's phone and there were 19 calls between their phones over the last three days. A reasonable juror could conclude that Shwar was feigning uncertainty about Harry's name to distance himself from the source of the boxes, which, in turn, could support an inference that Shwar knew the boxes contained contraband.

¶58        In his interview with Wyma, Shwar was vague about the boxes' intended recipient and destination, stating that once they arrived in Ohio, Harry would dispatch a "friend" to "come . . . grab the boxes" at a location yet to be determined. A reasonable juror could find Shwar's ignorance of the intended recipient and destination of the boxes to be indicative of an illicit transaction. More specifically, a reasonable juror could conclude that Shwar must have known, from the secrecy surrounding the intended recipient and destination of the boxes, that they contained contraband.

¶59        The boxes were packaged, sealed, and bore prepaid USPS shipping labels, and so they could easily have been shipped via United

States mail. A reasonable juror could infer that the boxes were instead being transported in the sleeper compartment of a private semi-truck to avoid exposing the boxes to the attention of government officials.

**¶60**　　　　Viewed together, these facts link Shwar to the cocaine in such a manner and to such an extent that a reasonable jury could infer that Shwar knew that the boxes he was transporting contained illegal drugs. And because the number of boxes, and the substantial quantity of cocaine they contained, were not consistent with personal use, a reasonable jury could conclude that Shwar knew that the boxes' contents were being transported for sale.

**¶61**　　　　Shwar offers a number of possible innocent explanations for the underlying facts, arguing, for example, that he made and received calls from Harry simply as a favor to Garg due to his hearing difficulties. Similarly, he points out that there was no evidence that he received payment for transporting the boxes and that law enforcement failed to investigate his finances to determine if he received income from unexplained or illicit sources.

**¶62**　　　　Shwar's arguments effectively ask us to reweigh evidence already considered by the jury, resolving conflicts in his favor, which we will not do. *See State v. Jones*, 188 Ariz. 388, 394 (1997). Because there was sufficient evidence to sustain the jury's finding that Shwar knew that the boxes contained cocaine being transported for sale, we affirm.

## CONCLUSION

**¶63**　　　　For the foregoing reasons, we affirm.



AMY M. WOOD • Clerk of the Court
FILED: AA