NOTICE: NOT FOR OFFICIAL PUBLICATION.
UNDER ARIZONA RULE OF THE SUPREME COURT 111(c), THIS DECISION IS NOT PRECEDENTIAL
AND MAY BE CITED ONLY AS AUTHORIZED BY RULE.

IN THE

# ARIZONA COURT OF APPEALS
### DIVISION ONE

STATE OF ARIZONA, *Appellee,*

*v.*

JOHN ADAM BACHLER, *Appellant.*

No. 1 CA-CR 22-0597
FILED 5-14-2024

Appeal from the Superior Court in Maricopa County
No.  CR2018-155975-001
The Honorable Justin Beresky, Judge

**AFFIRMED**

COUNSEL

Arizona Attorney General's Office, Phoenix
By Brian Coffman
*Counsel for Appellee*

Law Office of Stephen M. Johnson Inc., Phoenix
By Stephen M. Johnson
*Counsel for Appellant*

---

**MEMORANDUM DECISION**

Judge Michael S. Catlett delivered the decision of the Court, in which Presiding Judge Angela K. Paton and Judge James B. Morse Jr. joined.

---

**C A T L E T T**, Judge:

¶1        A jury convicted John Bachler ("Bachler") of first-degree, premeditated murder.  Bachler appeals his conviction and natural life sentence, arguing the superior court should have suppressed statements he made to law enforcement during a post-arrest interview.  Bachler also argues the superior court should have declared a mistrial because a detective testified about Bachler's mental state.  We reject both arguments and affirm.

## FACTS AND PROCEDURAL HISTORY

¶2        On July 4, 2017, Phoenix police and fire departments responded to a report of a deceased individual in a culvert a short distance from Bachler's neighborhood.  The victim, who was homeless, was lying on a makeshift bed, wearing only underwear, and had suffered five gunshot wounds.  The medical examiner determined the manner of death was homicide.  Police recovered a single shell casing at the scene.

¶3        Bachler visited the area where the homicide took place a few nights before the incident.  Then, on July 3 around 8 p.m., surveillance footage from a gas station showed Bachler with a handgun holstered and holding a plastic bag containing purchased items.

¶4        That same night, Bachler sent a string of text messages to his wife and mother complaining about the nearby homeless population. Those messages included the following statements: "I don't want my [kids] living in this area;" "I wanted to live further North;" and "I admitted to drinking, but this junky neighborhood has a sobering effect."  Bachler also asked, "What else should I show you?  A deceased carcass with a needle in its arm?  How about some young kid being raped by some heroin and meth addicts!"  Around 7:30 p.m., Bachler stopped texting, which his wife found unusual because he was "constantly on his phone."

¶5        After hearing about the homicide on the news, Bachler's wife called the police because she suspected her husband was involved.

Bachler's wife knew he was out in the neighborhood when the homicide occurred, and that he had stayed at a nearby hotel that night. Bachler kept abreast of neighborhood activity, so his disinterest in the crime shocked her, particularly because Bachler often complained about the homeless population living nearby. She once heard him comment, "if I could get away with killing one of those lowlifes, I would." She also recalled that he previously "said something about [how] fireworks would be good to cover up gunshots."

¶6        Bachler's wife grew more suspicious after asking Bachler what he did with the clothes he was wearing the night of the murder and he responded that he had thrown them away because they were "messed up with oil or grease." When she did not find the clothes in the trash, she confronted him, and he responded that he donated the clothes. He later said he donated his shoes because they were "too big."

¶7        Roughly a week later, the police searched Bachler's home and interviewed him. During the search, they could not locate Bachler's clothing from the night of July 3 or a 9mm handgun (a type of firearm Bachler owned, and the type used in the homicide).

¶8        On November 16, 2018, the Fugitive Apprehension Investigative Detail ("FAID") Unit arrested Bachler. Bachler asserts that transporting officers told him he had to confess and then threatened him, including by mentioning the death penalty, stating they "had him 'dead-to-rights,'" and telling him that he was "going to go down for 1st [d]egree [m]urder."

¶9        Upon arriving at the station, the transporting officer escorted Bachler to a room where a detective interviewed him. The interview started before 9 a.m. and lasted about six-and-a-half hours. Before beginning the interview, the detective read Bachler his *Miranda*[1] rights. During the interview, the police provided Bachler with access to a bathroom and gave him food and drink.

¶10        The detective showed Bachler a presentation, describing what the police had learned during the murder investigation and explaining why they had probable cause to believe he was responsible. Almost five hours into the interview, Bachler admitted to shooting the victim. He claimed it was "a freak, accidental, wrong-place-wrong-time" situation and there was

---

[1]        *Miranda v. Arizona*, 384 U.S. 436 (1966).

not "an altercation by any means." Bachler mentioned that he used a plastic shopping bag to catch the shell casings.

¶11       The State charged Bachler with first-degree murder. Bachler moved to suppress his confession. The superior court held a suppression hearing, during which a transporting officer, the investigating detective, and Bachler testified.

¶12       Bachler argued that his will was "completely overcome" during the interview, making his confession involuntary and inadmissible. He relied on the detective's comment that "I have a certain degree of control over my cases, and my most powerful tool is my discretion, I can make choices of what I, how I want to charge somebody versus the county attorney saying, no, you're doing this." According to the detective, he meant to convey only that the county attorney, and not the detective, would make the ultimate charging decision. Bachler testified that he interpreted the comment to mean the detective had the "ultimate" and "final say" on charging. Bachler also testified that when the detective mentioned that the county attorney had decided to charge him with premeditated murder, it scared him. Bachler thought that charge "meant death penalty," so the detective was his "savior" because if he said what the detective wanted to hear, the "death penalty [was] off the table."

¶13       Bachler also challenged the length of the interview. The detective testified that the interview took longer because Bachler discussed other topics—for example, his family, firearms, and politics. Bachler admitted during the interview, "I'm slowing things down. I'm talking too much. I'm sorry about that." At one point, the detective suggested, "Alright, let's jump back into this so we can get through this." At no point did the detective believe that Bachler wanted to end the interview; instead, the detective described it as a free-flowing, back-and-forth conversation.

¶14       The superior court denied Bachler's motion. The court found that the officers did not threaten Bachler during transport, the detective's comments about his discretion did not persuade Bachler to confess, and none of the factors in A.R.S. § 13-3988 supported suppression.

¶15       At trial, Bachler changed his story about the shooting. He testified that, after leaving the gas station, he went to the culvert where the victim was staying. Bachler said he exchanged words with the victim, who then brandished a knife and lunged at him, causing Bachler to shoot and kill the man in self-defense. He claimed he fled the scene without calling 911 and hid his gun and remaining ammunition. He checked into a nearby

hotel for the night; the next morning, he messaged his wife, who picked him up.

**¶16**        During trial, the interviewing detective testified about the investigation. When asked what stood out to him, the detective responded as follows:

> The firearm in the plastic bag really stood out to me . . . . So I have had, as you guys can probably imagine, I have had lots of training and experience being in homicide for almost ten years. I've seen hundreds of cases. I have been to training that talks about hundreds of cases. The firearm in the plastic bag shows to me or through my training and experience that there was *forethought* (emphasis added).

**¶17**        Bachler made an objection, which the court sustained. The detective then re-answered that "through my training and experience, again, I have had cases where we learned that the subject placed the firearm into a plastic bag in order to catch the shell casings, so they would not be discovered by law enforcement." Bachler did not object to that testimony.

**¶18**        Bachler moved for a mistrial, arguing that the State violated Arizona Rule of Evidence 704(b) by "ask[ing] the detective to . . . make a legal conclusion as associated with the bag," thereby testifying that Bachler had acted with premeditation. The State responded that the testimony was proper because it explained to the jury that the detective's "conclusions were based on the facts that he was finding" and "why that fact is important to him." The court declined to declare a mistrial, reasoning that, although the statements "started to cross the line," "[t]he jury will ultimately decide whether it means premeditation or could be a point toward premeditation." The court later instructed the jury that if the court "sustained an objection to a lawyer's question, you must disregard it and any answer given."

**¶19**        The jury convicted Bachler of first-degree, premeditated murder. The superior court sentenced Bachler to natural life in prison.

**¶20**        Bachler timely appealed. We have jurisdiction. *See* A.R.S. §§ 12-120.21(A)(1), 13-4031.

## DISCUSSION

### I.    Motion to Suppress

**¶21**        Bachler argues the superior court abused its discretion by not suppressing the incriminatory statements he made during the second interview, contending those statements were involuntary.  We review the superior court's ruling on a suppression motion for an abuse of discretion, considering only the evidence presented at the suppression hearing.  *State v. Wilson*, 237 Ariz. 296, 298 ¶ 7 (2015).  We view the evidence in the light most favorable to sustaining the superior court's ruling and defer to the court's factual findings unless clearly erroneous.  *State v. Rosengren*, 199 Ariz. 112, 116 ¶ 9 (App. 2000).  We review legal conclusions *de novo*.  *Id.*

**¶22**        The Fifth Amendment privilege against self-incrimination, applicable here through the Fourteenth Amendment, "is available outside of criminal court proceedings and serves to protect persons in all settings in which their freedom of action is curtailed in any significant way from being compelled to incriminate themselves."  *Miranda*, 384 U.S.at 467.  A confession voluntarily given "shall be admissible in evidence[.]"  A.R.S. § 13-3988(A).  "To find a confession involuntary, we must find both coercive police behavior and a causal relation between the coercive behavior and the defendant's overborne will."  *State v. Boggs*, 218 Ariz. 325, 336 ¶ 44 (2008).  We review the totality of the circumstances to determine whether the defendant's will was overborne.  *State v. Newell*, 212 Ariz. 389, 399 ¶ 39 (2006).  In asserting that his confession was involuntary, Bachler relies on the manner of his arrest, statements officers allegedly made to him during transport, the length of the interview, and promises the interviewing detective allegedly made.

**¶23**        Bachler first argues the "violent collision" with his vehicle, the presence of rifles and canines, and the "violent manner" in which he was apprehended contributed to the involuntariness of his later statements.  A restriction on a suspect's "freedom of movement" is a prerequisite to invoking the Fifth Amendment's protections.  *See State v. Maciel*, 240 Ariz. 46, 50 ¶¶ 12-13 (2016).  Recognizing that pre-condition, § 13-3988 focuses on the point at which an individual has been arrested.  *See* A.R.S. § 13-3988(C) ("Nothing contained in this section shall bar the admission in evidence of any confession made . . . at any time at which the person who made or gave such confession was not under arrest or other detention.").  There is, therefore, a distinction between the apprehension process, when a suspect is not yet in custody, and arrest, at which point a suspect is in custody and the Fifth Amendment applies.  *See Maciel*, 240 Ariz. at 50 ¶¶ 12-13.

¶24          Here, even assuming a "violent collision" occurred, and the police used rifles and canines to arrest Bachler, he was not yet in custody when those actions took place, so they do not render his later confession involuntary. The actions taken to apprehend Bachler occurred *before*—even if only shortly before—he was detained and thus before his right against self-incrimination attached. *See* A.R.S. § 13-3988(C).

¶25          Next, Bachler argues that the police made "threatening statements" enroute to the station, causing him to involuntarily confess hours later. Bachler claimed transporting officers mentioned the death penalty and told him that he had to confess, they "had him 'dead-to-rights,'" and "he was going to go down for 1st Degree Murder." A transporting officer denied making any of the alleged comments or hearing any other officer make threats. The superior court found that Bachler "was not threatened by the officers during the transport[.]" Because there was conflicting testimony, we defer to that factual finding. *See State v. Tapia*, 159 Ariz. 284, 288 (1988); *State v. Olquin*, 216 Ariz. 250, 252 ¶ 10 (App. 2007) ("[W]e do not impose our own determination as to the credibility of witnesses" and defer to the superior court since it "is in the best position to make that determination.").

¶26          Moreover, as the superior court observed, the video recording of the confession does not support Bachler's argument. At the beginning of the interview, Bachler said that "it is true I don't normally carry that [many] Second Amendment items." Soon after, he told the detective that "I think this all has something to do with" "crimes against my own children" by "not only my ex-wife but her brother-in-law." If transporting officers had threatened Bachler with first-degree murder charges only minutes earlier, it is unlikely he could have thought he was detained regarding crimes against his children. Bachler's comments discredit his version of events and support the superior court's factual finding.

¶27          Bachler next contends that his statements were involuntary because the interviewing detective suggested that "an admission would result in leniency in charging" and "in the ultimate punishment, which was reasonably perceived to be death." "Promises of benefits or leniency, whether direct or implied, even if only slight in value, are impermissibly coercive." *State v. Ellison*, 213 Ariz. 116, 127 ¶ 30 (2006). On the other hand, when an alleged promise is no more than a statement that a defendant's answers might make a difference in the charges, it does not render resulting statements involuntary. *See State v. Williams*, 27 Ariz. App. 279, 285 (App. 1976); *State v. McVay*, 127 Ariz. 18, 20 (1980) ("[W]here the alleged promise

is couched in terms of a mere possibility or an opinion, this is not deemed to be a sufficient promise so as to render a confession involuntary.").

¶28        Here, Bachler relies on the interviewing detective's statement that, "I have a certain degree of control over my cases, and my most powerful tool is my discretion, I can make choices of what I, how I want to charge somebody versus the county attorney saying, no, you're doing this." Bachler says this comment "led [him] to believe that only an admission would literally save his life from the death sentence penalty associated with 1st Degree Murder."  Our supreme court has held that similar statements did not cross the line into direct or implied promises.  *See*, *e.g.*, *McVay*, 127 Ariz. at 20 (determining an officer's statement that defendant's "cooperation would be made known to the warden and it was possible this would have an effect on his request to be released from isolation" was a "possibility rather than a promise");  *State v. Hall*, 120 Ariz. 454, 456 (1978) (authorities' statement that if appellant cooperated "it would possibly have an effect on the sentencing" was not a direct or implied promise);  *see also* *State v. Greenberg*, 236 Ariz. 592, 597–98 ¶ 22–23 (App. 2015) (detective's statement that it was possible for appellant to be charged only with a misdemeanor and see a judge in the morning was not a direct or implied promise).  At best for Bachler, the detective explained that he has some discretion in how suspects are charged.  The detective did not *promise* benefits or leniency, and so his statements did not render Bachler's confession involuntary.

¶29        Finally, Bachler argues that the length of his interview rendered his statements involuntary.  The length of an interview alone is insufficient to find a confession involuntary.  *Newell*, 212 Ariz. at 399 ¶ 41. In *Newell*, our supreme court noted that, during a fourteen-hour interview, the defendant was given multiple breaks to use the restroom, spent time alone, and had not been questioned the entire time—all factors undercutting the claim that statements were made involuntarily.  *Id*. ¶ 42. Here, the police read Bachler his *Miranda* rights, gave him breaks, and provided him with food and drink.  Moreover, the superior court found that Bachler prolonged the interview:  "[H]e went on for five or close to six hours, denying, first of all, that he was there; interrupting at every stage of investigation –- interview. Talking about things that had nothing to do with this case, the women he was out looking for, the baseball game.  He was talking about everything but."  Based on our independent review of the video recording of the interview, the superior court's conclusions were correct, not clearly erroneous.  *State v. Sandoval Beltran*, 1 CA-CR 23-0142, 2024 WL 1930995, at *2 (Ariz. App. May 2, 2024) (mem. decision) ("[W]e conduct an independent review of the video evidence, but we review that

evidence in the light most favorable to sustaining the trial court's ruling." (cleaned up)). The superior court did not err in denying Bachler's motion to suppress his confession.

## II. Motion for Mistrial

**¶30** Bachler also argues the superior court erred when it refused to declare a mistrial because of testimony from the interviewing detective. "The decision to grant or deny a motion for mistrial rests within the sound discretion of the [superior] court and the failure to grant a motion for mistrial is error only if such failure was a clear abuse of discretion." *State v. Koch*, 138 Ariz. 99, 101 (1983). The superior court "is always in the best position to determine whether a particular incident calls for a mistrial." *Id.* Declaring a mistrial is the "most dramatic remedy for trial error" and is only resorted to when "justice will be thwarted unless the jury is discharged and a new trial granted." *State v. Adamson*, 136 Ariz. 250, 262 (1983). When the superior court sustains an objection to witness testimony, two factors guide whether a mistrial is required: "whether the testimony called to the jurors' attention matters that they would not be justified in reaching their verdict" and "the probability under the circumstances of the case that the testimony influenced the jurors." *State v. Lamar*, 205 Ariz. 431, 439 ¶ 40 (2003).

**¶31** Arizona Rule of Evidence 702(a) says an expert may testify if "the expert's scientific, technical, or otherwise specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue." Rule 704(b) then provides that "[i]n a criminal case, an expert witness must not state an opinion about whether the defendant . . . ha[d] a mental state . . . that constitutes an element of the crime charged. Those matters are for the trier of fact alone." Ariz. R. Evid. 704(b).

**¶32** Here, the interviewing detective testified as a lay and expert witness. He provided lay testimony, based on personal knowledge, about the homicide investigation and what police learned throughout. He provided expert testimony about his broader investigative experience. During direct examination, the State asked, "was there something that particularly jumped out at you" or "[w]as there one particular point that you thought wow, this is different?" The detective answered:

> [T]he firearm in the plastic bag really stood out to me . . . . So I have had, as you guys can probably imagine, I have had lots of training and experience being in homicide for almost ten years. I've seen hundreds of cases. I have been to training that talks about hundreds of cases. The firearm in the plastic bag

shows to me or through my training and experience that there was *forethought* (emphasis added).

¶33      Bachler argues that the term "forethought" is synonymous with "premeditation," so the detective violated Rule 704(b) by testifying as an expert that Bachler acted with premeditation, an element of first-degree murder. *See* A.R.S. § 13-1105(A)(1). But even if the detective's testimony violated Rule 704(b), we conclude that it is highly improbable that the testimony influenced the jury.

¶34      The testimony was fleeting—the objectionable portion of the detective's answer consisted of a single word, "forethought." Bachler immediately objected and the court sustained the objection. The detective then re-stated his answer in a manner that was not objectionable. *See infra* ¶ 37. The court later instructed the jury to disregard any questions or answers if it had sustained an objection. We presume jurors follow instructions, including by disregarding information subject to a sustained objection. *Newell*, 212 Ariz. at 403 ¶ 68.

¶35      This is not an instance where "the risk that the jury will not, or cannot, follow instructions is so great" that a mistrial must result. *Bruton v. United States*, 391 U.S. 123, 135 (1968). Contrary to Bachler's assertion otherwise, there was ample additional evidence supporting premeditation. Examples include, but are not limited to, the following: Bachler's comments to his wife that "if [he] could get away with killing one of those lowlifes, [he] would" and that "fireworks would be good to cover up gunshots"; Bachler's visit to the area of the eventual crime scene just days prior; and Bachler's admission that he used the plastic bag to catch the shell casings. The superior court, therefore, did not abuse its discretion in denying a mistrial.

¶36      Bachler also challenges the detective's re-stated testimony that he has investigated cases where the suspect placed "the firearm into a plastic bag in order to catch the shell casings, so they would not be discovered by law enforcement." Because Bachler did not object to that testimony, we review for fundamental error. *See State v. Escalante*, 245 Ariz. 135, 140 ¶ 12 (2018). To establish fundamental error, a defendant has the burden to show "(1) the error went to the foundation of the case, (2) the error took from the defendant a right essential to his defense, or (3) the error was so egregious that he could not possibly have received a fair trial." *Id.* at 142 ¶ 21. To prevail under either of the first two prongs, but not to prevail under the third, the defendant must separately show prejudice. *Id.*

¶37        Bachler has not shown that the detective's re-stated testimony was objectionable. The detective explained only that, in prior cases, suspects have used plastic bags to avoid detection. That testimony still required the jury to decide whether Bachler used a plastic bag for that purpose. But, even if the detective's testimony suggested that Bachler did so, the detective did not comment directly on a mental state that is an element of the crime. *See* Ariz. R. Evid. 704(b). First-degree murder does not require an intent to avoid detection. While one could argue, first, that obtaining a plastic bag and then using it during a crime shows planning and, second, that planning shows premeditation, neither of those two conclusions *must* follow from the detective's statement. Even if the jury credited that statement, it still had to conclude (i) that Bachler obtained a plastic bag prior to the crime, (ii) that he used it during the crime, (iii) that he did so to avoid detection, (iv) that doing so to avoid detection required planning, and (v) that planning established premeditation. Thus, the detective's re-stated answer did not violate Rule 704(b).

¶38        Even if the superior court erred in allowing the detective's re-stated testimony, Bachler has not shown fundamental error. The detective's testimony did not go to the foundation of the case, take from Bachler a right essential to his defense, or deprive him of a fair trial. *See Escalante*, 245 Ariz. at 142 ¶ 21. Bachler took the stand in his own defense and testified that he had not placed his gun in a plastic bag, and thus Bachler had an opportunity to refute the detective's statement. At that point, it was up to the jury to determine the "credibility of the witnesses and the weight to be given their testimony." *Grijalva v. State*, 32 Ariz. 470, 475 (1927). And, as explained (*see supra* ¶ 35), there was ample other evidence in the record supporting premeditation. *See State v. Granados*, 235 Ariz. 321, 329 ¶ 35 (App. 2014) (holding defendant could not show prejudice when the objected-to evidence was cumulative).

## CONCLUSION

¶39        We affirm the court's denial of Bachler's motion to suppress and the resulting convictions and sentences.

